STEPHEN BISHOP ET AL. v. JONES & PETTY.

The rule of international comity, conceding to citizens of one friendly State or nation the right to prosecute suits in the courts of another, is, and in its nature can only be, a rule for peace. The *status* of war between previously friendly nationalities puts a termination to rights of this character until the restoration of peace; and there cannot be a "war for arms and a peace for commerce" co-existing between States or their respective citizens. It is a well established general rule, therefore, that resident citizens of one of the belligerents cannot bring or prosecute suits in the courts of the other.

To a suit instituted in March, 1861, on a note, the defendants plead that the usees and real plaintiffs were citizens of the United States and alien enemies, the sufficiency of which plea, as a legal defense, when filed, was not questioned either in the court below or this court.

A court of this State should not, on the 16th day of April, 1861, have decided, as a matter within its judicial knowledge, that war then existed between the United States and the Confederate States; and it was not error for the court below to exclude evidence then offered for the purpose of proving the existence of such a war, which evidence consisted of newspapers announc-

ing the bombardment of Fort Sumter by authority of the confederate government, and other intelligence then current and affirming the pendency of hostilities.

Although, in a popular sense, the late war may be said to have commenced at a period anterior to the date last mentioned, yet that sense·is not synonymous with the legal signification of the term "war." The mere suspension of the relations of peace usually subsisting between two nations does not constitute war between them. Commerce may be interdicted without producing war; and though reprisals and embargoes are forcible measures of redress, yet they do not, *per se,* constitute war. Even hostile attacks and armed invasions, although accompanied by destruction of life and property, and made by authorized officers of one government on the soil or jurisdiction of another, do not inevitably inaugurate war; for it may be that they will be atoned for and adjusted without war ensuing.

War, in its legal sense, has been aptly defined to be "the state of nations between whom there is an interruption of all pacific relations, and a general contestation of arms authorized by the sovereigns."

Though a previous declaration or notice is not indispensable before the commencement of war, yet there can be no war of which a court can take judicial notice until the war-making power of the government has, by some act or announcement, created or recognized the existence of a state of war. In the Confederate States, the war-making power was lodged in the Congress; and until it exercised that power, either by declaration or recognition of a state of war, the courts, no matter how imminent war might appear, could not say that amicable relations would not be restored without actual war.

If the Congress, when it did act upon the subject, had declared that war had existed from some anterior period, the courts would follow such a declaration, and, on the question subsequently arising before them, would take judicial notice of the existence of the war from the date thus fixed by Congress. But the courts could not, previous to such action by Congress, recognize the existence of war as a matter within their judicial knowledge.

The plea of "alien enemy" is merely dilatory, and at most can only operate to suspend the plaintiff's action until the termination of the war. Though it must be sustained when properly presented, yet it is called in the books an odious plea, and will not be aided by construction.

The judgment of the court below, rendered in foreclosing a mortgage and enforcing a vendor's lien, directed the issuance of an order of sale to the sheriff, "commanding him to seize and sell" the property "according to law, and apply the proceeds to the satisfaction of this judgment:" *Held,* that the judgment was in substantial, though not literal, conformity with the 119th section of the statute, which provides that judgments in such cases shall be rendered for an order to the sheriff "directing him to sell" the property, if found, "as under execution." (Paschal's Dig., Art. 1480, Note 576.)

It being objected in this court, though not in the court below, that there is a

trivial excess in the amount of the judgment appealed from, but no calculation demonstrating the excess being submitted, the court declines to make a computation for the purpose of ascertaining the truth of the objection. If the excess had been shown, and the plaintiff declined to remit it, this court would correct the judgment at the cost of the appellants.

Appeal from Bastrop.    The case was tried before Hon. A. W. Terrell, one of the district judges.

Few records are more painfully suggestive than that which furnishes this precedent.    On the 7th of October, 1857, L. C. Cunningham & H. Crocheron, of Bastrop county, Texas, sold to Stephen Bishop, N. M. Brice, and Benjamin Lyman a thousand acres of land, upon which was situated a saw and grist-mill, for the sum of $18,800, and in part payment the defendants executed their note of that date for $6,000, payable to Cunningham & Crocheron on the 1st day of May, 1858, with ten per centum interest after maturity.    The note reserved the vendor's lien upon the land and appurtenances sold.    As further security, Stephen Bishop; one of the defendants, executed his mortgage upon sixteen slaves, which he warranted "to be sound in body and mind and slaves for life."    There were some immaterial stipulations about indulgence.    The note was indorsed by Cunningham & Co. to J. H. Foushee, on the 16th of January, 1861, and on the same day Foushee indorsed it to Jones & Petty, the plaintiffs, without recourse.

On the 8th of March, 1861, Jones & Petty, as indorsees and holders, sued the makers.    The defendants plead the general issue, and also plead that Jones & Petty were not the real owners of the note, but in truth held it for the use and benefit of alien enemies of the United States of North America; that the United States is, and all the time has been since the institution of this suit, in a state of war against the Confederate States of North America, of which the defendants are citizens; that said United States is, and all the time since the institution of this suit has been, holding out and occupying a hostile attitude towards the Con-

federate States, in this: the political authorities of said United States have failed and refused to acknowledge the independence and existence of said confederacy; they have assumed to have the right to exercise jurisdiction over it; they are assuming to exercise the right to collect the revenue and impost duties belonging to it; they have been, since the institution of this suit, levying war, raising troops, and making every preparation for an invasion upon this confederacy; sending armed fleets to the ports and in the seas of the Confederate States; blockading the ports thereof; preying upon the commerce of said Confederate States; attempting to collect the revenue thereof; holding and occupying the forts, arsenals, and dock-yards belonging to and within the limits of said Confederate States, with armed troops and all munitions of war, with the belligerent purpose of destroying the nationality and independence of the Confederate States, and subjecting them to the Government of the United States; that the real owners and usees are alien enemies, residing in the United States, and whose names are unknown to the defendants, and that they are foreigners and aliens to the Confederate States, and that such usees, being alien enemies, are incapable of suing in this court.

The plaintiffs proved the note and indorsements, the vendors' lien, and the mortgage declared on. The case was submitted to the court without a jury, who rendered a judgment for $7,211, with ten per cent. interest, with a decree of foreclosure and an order to sell the land and negroes.

Under the statute which authorizes calling the adverse party to the stand as a witness, (Paschal's Dig., Art. 3754, Note 857,) the defendants introduced George W. Jones, one of the plaintiffs, with the view of proving that the plaintiffs, Jones & Petty, were not the real owners of the note sued on, that they held the mere naked legal possession thereof, for the use and benefit of parties who were,

and had been since the institution of the suit, resident citizens of the United States of America.   The court excluded the evidence, upon the ground that the defendants must first establish that war existed between the United States and the Confederate States before they would be permitted to introduce the testimony offered, to which ruling of the court the defendants excepted.

Thereupon the defendants insisted that war then existed between the Confederate States and the United States, and had continually since the institution of the suit, and that the court had judicial notice of the existence of said war, and all the current history of the country; and in proof that the court had this judicial notice, the defendants offered as evidence the public newspapers of the day, giving a full history of the current events of the time, all of which the court excluded, and rendered judgment for plaintiffs, and the defendants excepted.

Those things which the defendants urged that the court should know judicially, and which doubtless proved a state of war, were, that Abraham Lincoln was elected President by the constitutional number of votes on the first Tuesday in November, 1860; that thereat the leaders and people of certain southern States resolved that they would not live under a government presided over by an abolitionist; that the Legislature of South Carolina, being then in session, immediately called for a convention of delegates to be chosen by the people; that the people everywhere in those southern States took down the national flags and ran up lone-stars, palmettoes, tri-colors, pelicans, and various other emblems of separate nationality; that arms and munitions of war began to be purchased; that military parades, marching, and counter-marching, evincing the purpose of resistance, were rapidly organized in almost every town and neighborhood; that southern Senators and Representatives on the floors of Congress proclaimed their purpose not to live under "Black Republican rule;" that, upon telegraphic

signals from southern Senators, the Governors of North and South Carolina, Georgia, Florida, Alabama, and Mississippi seized all the forts and arsenals and national property within those States, except Forts Sumter and Pickens, which would not surrender; that, when the Harriet Lane went to Charleston harbor to victual the troops, she was fired upon by the military authorities of South Carolina and driven back. That the States passed secession ordinances in the following order: South Carolina, December 20, 1860; Mississippi, January 9, 1861; Alabama, January 11, 1861; Florida, January 11, 1861; Georgia, January 19, 1861; Louisiana, January 20, 1861; Texas, February 1, 1861; that Texas had formed a committee of safety, with one of the supreme judges at its head; had organized an army and marched to San Antonio, and captured General Twiggs and all the military forces and supplies in Texas, being about one-third of the United States army; that delegates from the first six named States had assembled in convention at Montgomery, Alabama, and on the 13th February, 1861, had established a provisional government and constitution; that on the 11th of March, 1861, these same delegates, being joined by delegates from Texas, ordained a constitution, which was submitted back to the secession conventions which elected them and ratified; that this constitution was modeled after the Constitution of the United States, all changes but one being for the worse; that these same delegates resolved themselves into a provisional congress; that that congress treated the States not in that confederacy as foreign, and levied a tariff upon the productions thereof, which had constituted nine-tenths of the merchandise consumed by the people; that it elected Jefferson Davis president, who, in his inaugural address, proclaimed the purpose of carrying war into the States of the Union; organized departments; increased the rates of postage; imposed restrictions upon navigation; organized an army;

established additional ports of entry; put the control of military operations under the command of the president; took from the States the forces, arms, munitions, forts, and arsenals, captured from the United States; promised to receive the volunteer soldiers, then in the service of the States, as part of the provisional army of the Confederate States; that on the 6th of March, 1861, this congress passed a law, which declared, "that in order to repel invasion, maintain the rightful possession of the Confederate States of America in every portion of territory belonging to each State, and to secure the public tranquillity and independence against threatened assault; the president be, and he is hereby, authorized to employ the militia, military, and naval forces of the Confederate States of America, and to ask for and accept the services of any number of volunteers, not to exceed one hundred thousand, who may offer their services, either as cavalry, mounted riflemen, artillery, or infantry, in such proportion of these several arms as he may deem expedient, to serve for twelve months after they shall be mustered into service, unless sooner discharged," these troops to be organized as the president should deem expedient, as part of the army of the Confederate States, and to be called into service at his pleasure.

These public acts, and many more of the same character, might well impress the enthusiastic and fiery counsel of the defendants with the belief that war existed between the United States and the Confederate States. It is due to the Government of the former to say, and perhaps the fact influenced the judge, that up to the term when the trial was had, all these threatening aggressions had been meekly borne. When armies, forts, arsenals, public property, and vessels had been captured, no resistance had been made. When the flag had been fired on, no shot had been returned. When all these immense trainings and preparations were going on, Congress remained silent.

When States declared that they were out of the Union, the public authorities took no notice of the fact. These facts, which Judge Terrell refused to notice judicially, have since been judicially noticed in a great number of cases by the highest courts. (Texas v. White & Chiles, 7 Wallace, 700; same case, 25 Tex. Supp., 465.)

But the defendants in this case offered to prove some special facts, showing that war really existed as a fact between the United States and the Confederate States, and for that purpose offered the Galveston News and New Orleans Delta, to show that United States troops were on the 2d of April being sent to reinforce Fort Pickens; that all United States war vessels were being employed; that orders had gone to the Charlestown navy-yard to put the Powhatan in commission forthwith; that troops had been placed on board ships with sealed orders; that some had actually landed at Fort Pickens; that the order for the evacuation of Fort Sumter had not been issued; that Mr. Lincoln, in conversation with two prominent southern gentlemen, had expressed his intention to recover the property taken possession of by the southern confederacy; that a member of the cabinet had said "a storm is coming;" that General Scott and the cabinet were in a hasty conversation, and considering the question of reinforcing Fort Sumter; that Fort Pickens had certainly been reinforced; that Sumter was to be evacuated and it was to be reinforced; that the mouth of the Mississippi was to be blockaded; stories about the elections and the finances; that Seward had declined to receive the southern commissioners; that he said "the policy of the Government is peaceful, but defensive if attacked; high officers are taking precautionary measures for the safety of the capital;" that Governor Curtin would recommend the Legislature of Pennsylvania to subscribe $500,000 for the defence of Washington; that members of the Virginia convention urged immediate secession, &c.; that President

Davis had called for nineteen thousand five hundred volunteers; various movements of southern troops; Lieutenant Talbot arrived at Charleston on the 8th April from Lincoln, and assured Governor Pickens and Beauregard that it was the intention of the President to reinforce Major Anderson at all hazards; he asked to be permitted to visit Fort Sumter, but was refused; on the 9th several war vessels had appeared around Fort Sumter; the confederate commissioners would leave Washington on the 10th, with all the other current periodical history of that time, and for the weeks extending back to the commencement of the suit. But the court excluded all this newspaper evidence to prove the existence of war, and therefore excluded the evidence of Jones to prove the ownership of the note; to which the defendants excepted. Judge Terrell had been taught, and he believed, that secession was a peaceful remedy, and would not acknowledge the existence of war. So, on the 15th of April, 1861, he rendered the judgment.

While these Bastrop lawyers were coolly debating the question of war, Beauregard was firing away at Fort Sumter.

On the 16th of April the defendants moved for a new trial, and filed several newspapers as evidence of the existence of war.

That this record may have a more lasting history in Texas, the following is copied, which was taken from the Galveston News, extra:

"NEWS OFFICE, *April* 14, 1861.—Latest from Montgomery. War commenced at last! Attack on Fort Sumter! An extra session of congress called! Letters of marque to be issued! Seizure of Washington proposed! Anticipated fall of Fort Sumter.

"MONTGOMERY, *April* 12.—An extra session of the confederate congress is called for on the 29th inst. Seven guns were fired to-day in front of the executive building, in presence of the cabinet members, in honor of the attack

on Fort Sumter by the confederate forces. There is great rejoicing among the citizens. Three cheers were given for General Beauregard and three more for President Davis. No further news from Charleston has been made public. The cabinet was in session all day, discussing important matters. Letters of marque and reprisal will be issued immediately. Governor Roman, in conjunction with Major Ben McCulloch, proposes to this Government to have twenty-five thousand men in Washington in ten days to take Lincoln and General Scott prisoners of war. Major McCulloch has ten thousand men now in Virginia, and purchased ten thousand stand of arms to circulate. The President has issued his call for an extra session of congress, to convene on the 29th of April."

"REJOICING IN MOBILE!—MOBILE, *April* 12.—The most intense excitement prevails. There is great rejoicing among the citizens. Fifteen guns were fired in honor of the attack on Fort Sumter."

"NEW YORK, *April* 12.—The United States Government has chartered the steamship 'Vanderbilt' as a transport. She proceeds to-day to the Brooklyn navy-yard to be fitted out."

"WASHINGTON, *April* 12.—Private dispatches leave no doubt that hostilities commenced at Charleston at an early hour this morning. Lincoln has notified Gov. Pickens that provisions would be sent to Fort Sumter 'peaceably or otherwise.'"

"HOSTILITIES AT CHARLESTON!—WASHINGTON, *April* 12.— Private southern dispatches leave no reasonable doubt that hostilities at Charleston commenced at an early hour this morning. Gen. Beauregard telegraphed from Charleston on the 8th to Mr. Walker, the secretary of war, 'that Lincoln had notified Gov. Pickens and himself that provisions would be sent to Fort Sumter peaceably or otherwise.' Mr. Walker (Montgomery, 10th) responds, 'to demand the evacuation, and, if refused, to proceed to reduce the fort.'

Gen. Beauregard (Charleston, 10th) replies, 'the demand will be made to-morrow at 12.' Mr. Walker (Montgomery, 10th) says to Gen. Beauregard, 'unless there are special reasons connected with your condition, it is considered proper for you to make the demand at an earlier hour.' Gen. Beauregard (Charleston, 11th) says, 'the reasons are special for 12 o'clock.'"

General Beauregard (Charleston, 11th) says, 'the demand sent 2, allowed till 6 to answer.'

Major Anderson (Fort Sumter, 11th) replies that his sense of honor and obligations to the Government prevent his compliance, adding, 'probably I will wait orders from the President, and if you don't batter us to pieces we will be starved out in a few days.'

Secretary Walker (Montgomery, 11th) then telegraphs General Beauregard, 'We do not desire needlessly to bombard Fort Sumter, and if Major Anderson will state when he will evacuate, and in the meantime will not use his guns against us until we fire, you are thus to avoid bloodshed. If something equivalent to this is not agreed to, reduce the fort in the most practicable manner.'

General Beauregard (Charleston, 12th) telegraphs Secretary Walker, 'he would not consent. I write to-day.' [The above correspondence is literally confirmed by official dispatches, except that the attack on Fort Sumter was commenced at $4\frac{1}{2}$ instead of 4 a. m. of the 12th.—EDITORS NEWS.]

"FIRING ON SUMTER CERTAIN.—AUGUSTA, *April* 12.— Passengers just arrived from Charleston announce that the firing on Sumter began this morning at half-past four o'clock."

"CHARLESTON, *April* 12.—The batteries of Sullivan's Island, Morris Island, and other points, opened on Fort Sumter this morning at 4 o'clock; Fort Sumter returned the fire. A brisk cannonading is being kept up. There is no information from seaboard. The military are under

arms.   The whole population is on the streets, and the harbor is filled with anxious spectators.   The floating battery is doing good service.   Up to 11 o'clock there had been no loss on our side.   Fort Sumter replied at 7 o'clock this morning, and has kept up an astonishing fire ever since.   A breach is expected to be made in Fort Sumter to-morrow.   Major Anderson's fire is principally directed against the floating battery.   War vessels are reported outside the harbor.   Only two soldiers are wounded on Sullivan's Island.   The range is now perfect from the land batteries; every shot tells.   It is thought from Major Anderson's fire that he has more men than was supposed. Fort Sumter will succumb by to-morrow.   It is raining at Charleston, but there is no cessation of the batteries.   A continuous steady fire on both sides is being kept up.   The cutter 'Harriet Lane' and the steam gun-boat 'Crusader' are reported off the bar, but have not entered the harbor. The War Department have yet no official dispatches. General Beauregard was at the batteries all day.   The Government expects Fort Sumter to succumb to-morrow. The firing continued all day.   Two of Fort Sumter's guns are silenced, and it is reported a breach has been made through the southeast wall.   No casualty has yet happened to any of the forces.   Only seven of the nineteen batteries have opened fire on Fort Sumter.   The remainder are held ready for the expected fleet.   Two thousand men reached the city this morning and immediately embarked for Morris Island."

"CHARLESTON, *April* 12, 11 *p. m.*—The bombardment of Fort Sumter is still going on every twenty minutes from the mortars.   It is supposed Major Anderson is resting his men for the night.   Three vessels of war are reported outside the bar.   They cannot get in on account of the roughness of the sea.   Every inlet to the harbor is well guarded. Our forces are having a lively time of it.   No one has as

20—XXVIII.

yet received any injury.   The floating battery works admirably well."

"Intercepted Dispatches.—Charleston, *April* 11.—Intercepted dispatches disclose that Mr. Fox, who visited Major Anderson on pledge of pacific purposes, devised a plan to supply Fort Sumter by force, and this plan has been adopted by the Federal Government, and is in progress of execution."

"Volunteers from Kentucky.—Louisville, *April* 12. Dispatches were received here to-day to hold the Kentucky volunteer regiment in readiness to move at a moment's notice, from the Montgomery war department."

"The Pennsylvania Militia.—Harrisburg, *April* 12. The legislative bill was reported in the house to-day, appropriating $5,000,000 to arm the Pennsylvania militia."

"From Montgomery.—Montgomery, *April* 12.—A grand serenade was given to-night to President Davis, Mr. Walker, secretary of war, and Mr. Reagan, postmaster general. Mr. Walker made a speech in response to the compliment thus tendered to him.   In the course of his remarks, he informed the people that an official dispatch had just been received from Charleston.   The dispatch contained the gratifying information that the fire from the confederate batteries had been vigorous and effective during the day, so much so that four of the guns in the fortress had been dismounted.   On the side of the confederate forces there had been no one killed or wounded, and none of the guns were injured.   Mr. Walker also stated it to be certain that Fort Sumter would be ours before to-morrow night.   He likewise proclaimed, that in less than three months the confederate forces would be in possession of the city of Washington.   Mr. Reagan, on being serenaded, responded in a forcible and patriotic speech.   Mr. Toombs and Mr. Benjamin were likewise serenaded, and are now speaking. Senator Bayard, of Delaware, is now here.   The regiments

of Colonels Anderson and Patton have passed through this city on their way to Pensacola. Orders have been issued prohibiting hostile vessels from passing Fort Pulaski. Hon. Roger A. Pryor has been appointed on General Beauregard's staff. Over seven thousand men from the border States have offered their services to the Confederate States."

War had thus commenced. But Judge TERRELL over-ruled the motion for a new trial.

The defendants appealed, and the record was filed on the 27th of April, 1861; and there the case rested until the war ended.

One of the plaintiffs fell in battle; the other commanded a regiment, and won the renown of a soldier, although he had most earnestly opposed the whole movement. The judge who tried the cause and two of the counsel of the defendant made their war records.

The war ended not in the rejoicings which this record indicates. The order to sell the sixteen slaves needed no reversal. Before the supreme court which had been created under the new constitution pronounced this decision these chattels had become free citizens.

The war had been fought upon the theory that a rebellion was being conquered. Every movement in the direction of reconstruction was upon that hypothesis. Upon that hypothesis Mr. Jones, for the appellee, suggested delay; but

*C. L. Robards*, for the appellants, thus argued the case:

I. At the time of the trial in the court below the Confederate States were such a nation or State as entitled it and its citizens to all the rights which belong to an independent belligerent nation and the citizens thereof.

II. The right to resist the collection of debt due an enemy is a belligerent right, of which every citizen may take advantage during war.

III. At the time of trial in the court below war, in a legal sense, existed between the Confederate States and the United States, which fixed the *status* of the respective governments and citizens thereof as enemies, of which the court should have taken judicial notice.

IV. War suspends the right of an alien enemy to sue in enemy courts, which applies as well to beneficiaries in a suit as to plaintiffs; hence plea of alien enemy is a good defense.

V. This court must determine the rights of the parties as they existed in the court below at the time of trial.

VI. The facts and verdict did not authorize the judgment rendered.

As to the first proposition, Vattel says: "Nations or States are bodies politic, societies of men, united together for the purpose of promoting their mutual safety and advantage by the joint effort of their combined strength." (Vattel, bk. 1, ch. 1.)

Tested by this definition, the Confederate States were "a nation," a "State." They were "bodies politic," "societies of men," "united together for the purpose of promoting their mutual safety and advantage by the joint effort of their combined strength."

Halleck defines "a sovereign State to be a nation or people organized into a body politic, and exercising the rights of self-government." (Halleck's Inter. Law, 64.)

Tested by this definition, the Confederate States were a "sovereign State." They were a "nation," a "people organized into a body politic, and did exercise the right of self-government."

Wheaton says: "Sovereignty is the supreme power by which any State is governed. This supreme power may be exercised either internally or externally.

"Internal sovereignty is that which is inherent in the people of any State, or vested in its ruler by its municipal constitution or fundamental laws. This is the object

of what has been called internal public law: *droit public interne.*

"External sovereignty consists in the independence of one political society in respect to all other political societies."

He further says: "Sovereignty is acquired by a State either at the origin of the civil society of which it is composed, or when it separates itself from the community of which it previously composed a part, and on which it was dependent.

"This principle applies as well to internal as to external sovereignty. But an important distinction is to be noticed in this respect between these two species of sovereignty. The internal sovereignty does not depend in any degree upon its recognition by other States. A new State springing into existence does not require the recognition of other States to confirm its internal sovereignty.

"The existence of the State *de facto* is sufficient in this respect to establish its sovereignty *de jure.* It is a State because it exists.

"Thus the internal sovereignty of the United States was complete from the time they declared themselves free, independent, and sovereign, on the 4th of July, 1776. It was on this principle that the Supreme Court, in 1808, in the case of McIlvaine v. Cox's Lessee, 4 Cranch, 212, determined that the several States composing the Union, so far as regards their municipal regulations, became entitled, from the time when they declared themselves independent, to all the rights and powers of sovereign States, and that they did not derive them from concessions made by the British king. The treaty of peace of 1782 contained recognition of their independence, not a grant of it. From hence it resulted that the laws of the several State governments were, from the date of the declaration of independence, the laws of the sovereign States, and as such were obligatory upon the people of such State from

the time they were enacted." (Wheaton's International Law, 30.)

"The external sovereignty of any State, on the other hand, may require recognition by other States, in order to render it complete and perfect. So long, indeed, as the new State confines its action to its own citizens, and to the limits of its own territory, it may well dispense with such recognition. But if it desire to enter into that great society of nations, all the members of which recognize rights to which they are mutually entitled, and duties which they may be called upon reciprocally to fulfill, such recognition then becomes essentially necessary to the complete participation of the new State in all the advantages of this society. Every other State is at liberty to grant or refuse this recognition, subject to the consequences of its own conduct in this respect; and, until such recognition becomes universal on the part of the other States, the new State becomes entitled to the exercise of its own external sovereignty as to those States only by whom that sovereignty has been recognized." (Id.)

According to the principles thus clearly announced by this able writer, the Confederate States were not only a State *de facto*, but as to its internal relations its sovereignty was *de jure*. It was a State, as to its internal relations, complete in all its parts. From the date of their ordinances of secession the "internal sovereignty" of each was "complete." From that date they were "entitled to all the rights and powers of sovereign States, so far as regarded their municipal regulations," and their laws were "obligatory upon their people."

Though their "external sovereignty" may not have been complete on account of the want of recognition by other foreign States, yet this cannot affect the rights of the people within the limits of the internal sovereignty.

The cases of McIlvaine v. Cox's Lessees and The Santisima Trinidad, (7 Wheat., 283,) were quoted at length.

The Confederate States were recognized as a belligerent nation by various foreign Powers, and neutrality was avowed. Though this neutrality was not always strictly observed by foreign Powers, nor did they always extend to them the rights of a belligerent nation, yet it was not because the Confederate States were not entitled to them according to the law of nations, but because it did not suit their convenience, or their interest, or their policy.

Wheaton also says: "A civil war between the members of the same society is what Grotious calls a mixed war; it is, according to him, public on the side of the established government, and private on the part of the people resisting it. But the general usage of nations regard such a war as entitling both the contending parties to all the rights of war, as against each other, and even as respects neutral nations." (Wheat. Ele. of Inter. Law, bk. 4, ch. 1, § 7, p. 365.)

Halleck, in speaking of civil war, says: "Both parties may be entitled to the rights of war, towards each other, and consequently to the rights of belligerents with respect to foreign States as neutrals in the contest." (Halleck, ch. 3, § 20, p. 73.)

Thus the authorities uniformly concur in the proposition, that when a nation is divided in a civil war, both parties, as against each other, are entitled to all the rights of war which belong to independent nations at war. So far as I have been able to examine this is without exception.

If this proposition be correct, then the Confederate States, at the time of the trial of the case in the court below, was entitled to all the rights of an independent nation at war.

But the Supreme Court of the United States, in the celebrated "Prize Cases," has fixed the *status* of the citizens of the Confederate States. (2 Black, 665.)

But it was contended in the court below, that on the

15th and 17th of April, 1861, war did not exist; if it did exist, it should have been proved.

Vattel says: "War is that state in which we prosecute our right by force." (Vattel, bk. 3, ch. 1, § 1.) He advises a declaration of war, but adds: "He who is attacked, and only wages defensive war, need not make any hostile declaration." (Id., bk. 3, ch. 4, § 57.)

Phillimore says: "So far as the practice of nations is concerned, a precedent declaration of war is unnecessary." (Law Library, vol. 22; Philli. on Inter. War, vol. 3, 116;) and he devotes a whole chapter to prove this rule, and cites many cases.

Mr. Kent says: "Since the time of Bynkershock it has been the practice of Europe that war may lawfully exist by a declaration which is unilateral only, or without a declaration on either side. It may begin with mutual hostilities." (1 Kent's Com., 64.)

Halleck says: "The practice of a formal declaration of war has fallen into entire disuse. That the legitimate consequences of war flow directly from the state of public hostilities, and that the effects which the voluntary law of nations attributes to solemn war date, with respect to belligerent rights, from the commencement of hostilities, and with respect to neutral duties from an official announcement or a positive knowledge of the existence of the war." (Hall. on Inter. Law, p. 355, and authorities cited.)

"Thus the war between the United States and Mexico commenced by a conflict of armed forces on the disputed territory, and without any declaration on either side; so the war of 1772 between France and Great Britain, and the war of 1778 between the same Powers." (See cases cited by Philli., vol. 3, p. 104.)

But the Supreme Court of the United States (already cited) has settled this question for us.

It was contended by the appellants in this case that Congress alone had the power to declare war; that until Con-

gress had declared or recognized the existence of war, war in a legal sense did not exist, and its consequences did not flow.

Sumter was bombarded on the 12th April, 1861. The President of the United States issued his blockade proclamation on the 15th April, 1861. The trial in this case, it will be remembered, was had in the court below on the 15th April, 1861, and the motion for a new trial on the 17th April, 1861.

The court held in the "Prize Cases:"

"A state of actual war may exist without any formal declaration of it by either party, and this is true of both a civil and a foreign war.

"As a civil war is never publicly proclaimed *en nomine* against insurgents, its actual existence is a fact in our domestic history which the court is bound to notice and to know.

"The true test of its existence, as found in the writings of the sages of the common law, may thus be summarily stated, when the regular course of justice is interrupted by revolt, rebellion, or insurrection, so that the courts of justice cannot be kept open, civil war exists, and hostilities may be prosecuted on the same footing as if those opposing the governments were foreign enemies invading the land.

"This greatest of civil wars was not gradually developed by popular commotion, tumultuous assemblies, or local unorganized insurrection. However long may have been its previous conception, it nevertheless sprang forth suddenly from the parent brain a Minerva in the full panoply of war. The President was bound to meet it in the shape it presented itself, without waiting for Congress to baptize it with a name, and no name given to it by him or them could change the fact."

Again this court says:

"They cannot ask a court to affect a technical ignorance of the existence of a war which all the world acknowledges

to be the greatest civil war known. in the history of the human race, and thus cripple the arm of the Government and paralyze its power by subtle definitions and ingenious sophisms."

Again this court held:

"The proclamation of blockade by the President is of itself conclusive evidence that a state of war existed, which demanded and authorized recourse to such a measure."

These principles are conclusive of the point.

*Jones & Petty*, for the appellees, suggested delay.

MOORE, C. J.—On the 8th day of March, 1861, the appellees, who were citizens of Bastrop county, brought suit in the District Court of said county against the appellants, on a note payable to Cunningham & Crocheron or bearer, and to enforce a mortgage and vendor's lien, which they claimed to hold for the security of the amount due on said note. On the 16th day of April, 1861, the appellants filed an amended answer, in which they alleged that the appellees have no right, title, or interest in said note; that they hold the mere possession of the same, and have the naked legal title to it for the use and benefit of alien enemies; that said usees and beneficiaries of said note reside in and are citizens of the United States of North America; that said United States is, and at all times since the institution of the suit against them had been, in a state of war against the Confederate States of North America, &c.

On the trial of the cause, appellants proposed to prove by one of the appellees that they were not the real owners of the note, but held merely the naked possession thereof for the use and benefit of parties who were, and had been since the institution of the suit, resident citizens of the United States of America. The evidence was excluded by the court, because the appellants had not proved the

existence of war between the United States and the Con-
federate States, notwithstanding it was insisted by the
appellants that the court should take judicial notice of the
existence of such war; and for the purpose of showing it
to be a matter within the judicial knowledge of the court,
they referred to, and proposed to read as evidence to the
court, the current newspapers of the day.   Appellants, on
the 17th day of April, the day after judgment was ren-
dered against them, asked for a new trial on the ground of
newly-discovered evidence.    This newly-discovered evi-
dence consisted solely of New Orleans and Galveston news-
papers, which reached the town of Bastrop (where the trial
of the cause was had) after its conclusion, in which was
contained an announcement of the demand by General
Beauregard for the evacution of Fort Sumter, and its sub-
sequent bombardment by the order of the secretary of war
of the Confederate States, together with the other trans-
piring events of that period.    The motion for a new trial
was refused.    This ruling of the court, and its exclusion
of the testimony offered on the trial to which we have
adverted, are relied upon as the leading grounds for a
reversal of the judgment.

   The right of prosecuting suits by citizens of one friendly
Power in the courts of another is a well-established rule
of international comity.    This, however, is, and in the
very nature of things can only be, a rule for peace.   War
terminates all friendly intercourse between the citizen of
hostile States.    There cannot be, as has been frequently
said, "a war for arms and a peace for commerce."    To
suffer individuals to carry on commercial or friendly inter-
course while the two governments are at war, would be
placing the act of the government and the acts of indi-
viduals in contradiction with each other.    Certainly such
antagonism by the citizen to his government cannot
receive the sanction or encouragement of its courts, much
less will they become instrumental in giving aid and pro-

tection to its enemies.   It is therefore not to be disputed, as a general rule, that the resident citizens of one belligerent cannot bring or prosecute a suit in the courts of the other.   There are, however, certain exceptions to this general rule, as well established as the rule itself. Although the ruling of the District Court was not based upon this ground, it may not be amiss for us to inquire if the present suit did not come within the exceptions to the general rule, if indeed the court should have taken judicial notice that war existed between the United States and the Confederate States when the question was presented for decision in the District Court.

As we have seen, the general rule depends upon and grows out of the fundamental principle, that when the sovereign power of a State declares war against another State, it implies that the whole nation declares war, and that all the subjects or citizens of the one are enemies to those of the other; and all intercourse and transactions with those who are enemies of the State is illegal, and should be condemned, because it contravenes the object and policy of the government, embarrassing the operation of war, and lessening the ability and efficiency of the government in its prosecution.   But when the sovereign sanctions the act, or such sanction must necessarily be inferred from his act, this principle is not applicable, and the rule is not enforced. Thus, ransom bills and bills of exchange drawn by a prisoner of war in favor of an enemy for his necessary support while detained as a prisoner are held to be valid contracts. (Antoin v. Morehead, 6 Taunt., 237.)   So, also, when a particular trade or intercourse is carried on under a special permit from the sovereign; and likewise when an enemy remains in the country, or comes to reside therein by special permission of the government after the breaking out of hostilities.   In such cases he is unquestionably entitled to protection in his person and property, and may seek redress for an injury to either in the courts of the country

wherein he is thus residing pending the war. (Sparen-
burgh v. Bannatyne, 1 Bos. & Pull., 163; Wills v. Wil-
liams, 1 Lord Raym., 282; 1 Lutw., 34; 1 Salk., 46.) And
it has even been held, when an alien continued to reside in
the country after the commencement of hostilities, that the
courts will presume he does so by permission of the gov-
ernment. It is also said that it may now be regarded in
accordance with universal public law, that aliens who
have come to reside in the country during peace shall be
allowed a reasonable time after the inception of war to
wind up their business and remove from the country with
their property and effects, and during the time they thus
remain they are entitled to protection in their persons and
property, and may either sue or be sued. (Clark v. Morey,
10 John., 72.) It is also to be observed, that the act of
Congress of the 6th of July, 1798, authorized the Presi-
dent of the United States, in case of war, to direct the
conduct to be observed towards the subjects of the hostile
nation, being aliens, and within the United States, and in
what cases and upon what security their residence may be
permitted; and in reference to those who are to depart, it
declares that they shall be allowed such reasonable time
as may be consistent with public safety and according to
the dictates of humanity and national hospitality, "for the
*recovery*, disposal, and removal of their goods and effects, and
for their departure." The statutes of the United States,
passed before the secession of the States forming the con-
federacy, were as obligatory on these States subsequently
to that time as they had been prior thereto, if not inappli-
cable on account of their changed political condition. It
might, no doubt, have been justly urged, in view of the
attitude of the Government of the United States towards
the Confederate States, that there would have been no just
ground of censure against the confederacy if the immuni-
ties of this statute had not been extended to citizens of the
United States residing in the confederacy. But this in no

way militated against the power of the President of the Confederate States to exercise the functions conferred by this law, if, indeed, he was not authorized to do so by an act of the provisional congress of the Confederate States; especially as it is, as we have seen, nothing more than the generally recognized public law upon the subject. Nor should the court have presumed, in advance of the action of the Government, that this general usage of civilized nations would be violated by the Confederate States. To have done so would have been very wrong in theory and false in fact. The action of the confederate authorities went to the full extent of the rule by which the most enlightened and liberal nations are guided. The President of the Confederate States, by a proclamation issued shortly after the commencement of the war, fixed the time within which alien enemies should leave the country. Until the expiration of that time, they remained with the consent and under the protection of the government, and could therefore sue and be sued.

It may be insisted that, as the beneficiaries in this suit are alleged to have been resident citizens of the United States, it is to be presumed they were not at that time in the confederacy, and therefore they are not protected by the proclamation, which applied only to such persons as were within its jurisdiction. To this it is sufficient to say, that the parties by whom the suit is brought were here. They did not come in violation of belligerent obligations into the country after the commencement of the war. The reason why a suit cannot be sustained by a citizen for the benefit of an alien enemy is, to prevent fraud upon the court, because what cannot be done directly should not be permitted indirectly. If, then, the principal might have recovered the property to which he was entitled by suit in his own name, for the purpose of removing it from the country, we see no reason why this could not be done by his agent.

The question upon which the case was decided in the court below seems to be equally well settled against the appellants. Could the court say, as a matter of judicial knowledge, on the day the motion for a new trial was overruled, that war existed between the Confederate States and the United States? We answer this question emphatically in the negative. Viewed in the light of subsequent events, we may and do in the popular sense speak of the war as having commenced at a period anterior to that on which this case was acted upon in the court below. But when we thus speak, we may and generally do attach a very different signification to the word from that which must be given it by law. War does not exist merely on the suspension of the usual relations of peace. Commerce may be interdicted without producing it. Reprisals and embargoes are forcible measures of redress, but do not, *per se*, constitute war. Hostile attacks and armed invasions of the territory or jurisdiction of a nation, accompanied by the destruction of life and property by officers acting under the sanction and authority of their governments, however great and flagrant provocations to war, are often atoned for and adjusted without its ensuing. War in its legal sense has been aptly defined to be "the state of nations among whom there is an interruption of all pacific relations, and a general contestation of arms authorized by the sovereign." It is true, it may and has frequently in latter times been commenced and carried on without either a notice or declaration. But still, there can be no war by its government, of which the court can take judicial knowledge, until there has been some act or declaration creating or recognizing its existence by that department of the government clothed with the war-making power. In the Confederate States, congress was invested with this power. Until it acted, however great the provocation, or imminent its probability, the courts could not say that amicable relations might not be restored

without actual war. If congress, when it acts, should declare the war to have existed anterior to its declaration, the courts will follow the declaration; and, if the question should be subsequently brought before them, the courts will follow the declaration, and take judicial notice of its existence from the time thus fixed. But for them to attempt to declare its existence as a matter of legal knowledge, before any action has been taken by the war-making power, would be a most flagrant violation of duty. This was not done by the congress of the Confederate States until subsequently to the time when, it is urged, the District Court should have said, as a matter of judicial knowledge, that the war had commenced.

We have answered the question here presented, as it was discussed, as if the late war had been between two independent Powers, and there being, on this hypothesis, no error in this ruling, we have not deemed it necessary to inquire whether the character of the Government of the United States and the relationship of the States of the Union to it require the application of different principles from those by which it should have been decided if the Confederate States had succeeded in their attempt to sever their connection with the United States. But we may well say, if there were any error in the ruling of the court, though, as we have seen, there was none, it has not and cannot work any injury to the appellants. Their plea was merely dilatory, and would only have stayed the appellees' suit until the termination of the war. Though it should be upheld and sustained in cases to which it is applicable when properly presented, yet it is called in the books an "odious plea," (Clark v. Morey, *supra*,) and it will not, therefore, be aided by construction. To reverse the judgment on account of the action of the court in this matter would be to send the case back to the District Court, not now to correct its ruling, but to render again the very judgment which it has already given. The error, if one,

is now immaterial, and the judgment, it seems, should not therefore be reversed.

It is assigned for error, that the judgment of the District Court, decreeing the sale of the property upon the mortgage and vendor's lien, does not follow the statute. The judgment directs an order of sale to issue to the sheriff of Bastrop county, "commanding him to seize and sell" the property "according to law, and apply the proceeds to the satisfaction of this judgment." The statute (O. & W. Dig., Art. 504;) provides that judgment shall be rendered for an order of sale to the sheriff, "directing him to sell" the property "as under execution." We think the judgment is substantially, though not literally, in conformity with the statute. If the sale had been directed "as under execution," the sheriff must look to the law for his guide in performance of the duty enjoined upon him. Although he is not referred by the judgment to the law regulating sales under execution for the rules by which he must be governed in the enforcement and carrying into effect the order of sale, yet as there is no other law regulating his official action in the discharge of such duties, it cannot be said that there is any uncertainty, or that he would have been at any loss in determining by what law he should be guided in carrying the order of the court into effect.

It is also complained that the judgment is between $5 and $6 larger than it should be. No calculation has been furnished us, and we will not undertake to make one to ascertain if this be the case, especially as the amount is so trivial in comparison with the debt. If the excess had been shown, unless remitted, it would have been corrected by the court, in accordance with its usual practice, at the cost of the appellants.

No error having been shown in the record for which the judgment should be reversed, it is

AFFIRMED.