FREDERICK W. VANDERBILT, REGINALD C. VANDERBILT, HENRY B. ANDERSON and FREDERICK L. MERRIAM, as Executors of the Last Will and Testament of ALFRED G. VANDERBILT, Deceased, Plaintiffs, *v.* TRAVELERS INSURANCE COMPANY, Defendant.

(Supreme Court, New York Trial Term, June, 1920.)

Insurance (life) — policy of — when there can be no recovery for death resulting from war.

> Where a policy of life insurance provides that it shall not cover death resulting directly or indirectly, wholly or partly from war or riot, the death of the insured by drowning as a result of the sinking of the British steamer *Lusitania* by order of the Imperial German government must be held to be a result of war; hence there can be no recovery under the policy.

ACTION upon a policy of life insurance.

Roy G. Gasser, for plaintiffs.

William J. Moran, for defendant.

McAVOY, J.  The defendent by its policy of insurance issued in August of 1903 undertook the liability to pay the principal sum mentioned therein for loss of life of the insured.  The insured, Alfred G. Vanderbilt, on the 7th of May, 1915, while the policy of insurance was in full force and effect, was traveling as a passenger and was on board the British steamer *Lusitania,* then bound from New York to Liverpool, Eng. This vessel was sunk at a point off the coast of Ireland, and when she was so sunk and as a result thereof Alfred G. Vanderbilt lost his life by drowning.  The *Lusitania* was sunk in accordance with instructions of the Imperial German government by torpedoes fired from a submarine vessel which belonged to and was commanded by a commissioned officer of said Imperial

German government, and the officers and crew thereof were a part of the naval forces of the Imperial German government. A state of war existed and was then being waged between the United Kingdom of Great Britain and Ireland and the Imperial German government. The *Lusitania* was subject to call in the war service by the United Kingdom of Great Britain and Ireland as an auxiliary cruiser, but at the time of the sinking she had not been so called and was engaged as a passenger and freight carrying merchantman, and was unarmed and carried neutrals and non-combatants, together with various sorts of infantry equipment, fittings and the like. The attack upon her by the German submarine vessel was made without any notice or warning of an intention to sink or attack her, and no opportunity was given to those on board to leave her, and no provision for safeguarding the lives of those upon her was made. The policy contains a clause which, omitting the non-pertinent part, reads in paragraph 4 of its provisos: '' Nor shall this insurance cover * * * death * * * resulting, directly or indirectly, wholly or partly, from * * * war or riot.'' It is the plaintiffs' contention that since the transaction violated the common usages and acceptances of principles of enlightened nations, termed the laws of war, the death of the insured may not be ascribed to the excepted condition of the policy. Opposed to this the defendant asserts that however execrable may be the act of the belligerent it is none the less, with respect to private persons, a result of war after a formal declaration thereof and comes within the conditions which would excuse performance under the policy of payment of the sum for which the decedent was insured. These opposing contentions involve a ruling which will define the sense in which the word '' war '' was applied by the company in the terms of its policy and received by

Supreme Court, June, 1920. [Vol. 112.

the insured at the time of its execution and acceptance. The common understanding of the meaning of "war," as related to its likelihood to be the cause of death, and the interpretations given to the usage of such a term in the current of juridical history would be controlling. In the broad sense the death of the insured on board the *Lusitania* must be conceded to be a result of war, because it came about in a contest conducted by armed public forces and during a state of affairs during the continuance of which the parties to the war were exercising force each against the other. Doubtless hostilities existing between the two nations may be confined in their nature and extent, be limited as to places, persons and things, but in the exercise of force by bodies politic against each other for the purpose of coercion, whether the contest is carried on by force or by deceit or by means covered by rules of conduct which reason deduces as consonant to justice which ought to regulate the political intercourse of nations both in peace and war, these limitations designed to protect non-combatants, neutrals and others wholly disassociated from the armed conflict itself have been repeatedly offended against and flouted even in civilized times by Christian sovereignties. It would appear that adherence is given the doctrine maintained by Bynkershoek in these instances; that everything done against the enemy is lawful; that he may be destroyed though unarmed and defenseless; that fraud or even poison may be employed against him; that the most unlimited right is acquired to his person and property, and that war admits of no limitations or restraint which any nation is bound to respect in its dealings with the other. In the narrower sense war may be regarded as controlled within absolute law which can be ascertained, applied and enforced by a body of rules properly applicable as occasion arises, and that civilized nations have consented that this body of law

should form the rules of their conduct in their rela-
tions with each other. This was the view of Gentilis,
whose definition is *bellum est publicorum armorum
justa contentio,* and the view of Phillimore (vol. 3,
p. 82), who says: " War is not to be considered as an
indulgence of blind passions, but as an act of deliber-
ate reason. \* \* \* It is regulated by a code as pre-
cise and as well understood as that which governs the
intercourse of states in their pacific relations to each
other. As war is the conflict of societies, that is, of
corporate bodies, recognized and governed by law in
all their actions, war must be and is carried on with
reference to rules and principles of law governing that
particular mode of social action." These views, how-
ever, of the modern jurists which have caused to be
introduced into modern warfare many benign in-
fluences, " which shed a few faint rays upon the
gloom of war barely sufficient to disclose its hor-
rors," owe their existence altogether to mutual
concessions and constitute merely voluntary relin-
quishments of the rights of war. *The Rapid,* 8 Cranch,
(U. S.) 155. Our national Supreme Court early con-
cluded that " every contention by force between two
nations in external matters under authority of their
respective governments is not only war, but public
war; \* \* \* one whole nation is at war with another
whole nation, and all the members of the nation declar-
ing war are authorized to commit hostilities against
all the members of the other in every place and under
every circumstance." *Bas* v. *Tingy,* 4 Dallas, 37.
And in *Montoya* v. *United States,* 180 U. S. 261, the
horrors and cruelties accompanying the depredations
of Indian tribes through military force were held to
constitute a state of war. The court there stated that
the acts of a collection of marauders might be treated
on the one hand as the performances of " a ' band '
whose depredations \* \* \* are part of a hostile

demonstration against the Government or settlers in general, or are for the purpose of individual plunder. If their hostile acts are directed against the Government or against all settlers with whom they come in contact, it is evidence of an act of war." It would seem to follow, therefore, that the argument for a holding that this act was not one of war cannot be admitted. The theory that modern usage and custom with its more humane and wise policy " constitutes a rule which acts directly upon the thing itself by its own force and not through the sovereign power is not allowed." Usage and custom prescribing the restraints imposed for the protection of non-combatants and third persons generally is merely " a guide which the sovereign follows or abandons at his will. The rule, like other precepts of morality, of humanity, and even of wisdom, is addressed to the judgment of the sovereign, and although it cannot be disregarded by him without obloquy, yet it may be disregarded." *Brown* v. *United States,* opinion by Chief Justice Marshall, 8 Cranch, 109. The concessions of the parties that the *Lusitania* was sunk in accordance with instructions of a sovereign government by the act of a vessel commanded by a commissioned officer of that sovereign government, being then operated by that said officer and its crew, all of whom were part of the naval forces of the said sovereign government, and that war was then being waged by and between Great Britain, the sovereign controlling the *Lusitania,* and Germany, the sovereign controlling the submarine vessel, control the conclusion which must be reached that the casualty resulted from war and that the consequences of the casualty come within the excepted portions of the policy.

Judgment accordingly.