(No. 7139.  January 17, 1944.)

ARTHUR E. ROSENAU and FREDA S. ROSENAU, Respondents, v. IDAHO MUTUAL BENEFIT ASSOCIATION, a corporation, Appellant.

[145 Pac. (2d) 227.]

Z. Reed Millar for appellant.

Estes and Felton for respondents.

DUNLAP, J.—Appellant issued its policy No. E48740, insuring the life of one of its members, Howard A. Rosenau, the son of respondents, in the sum of $1000.00. Respondents are named therein as beneficiaries. The policy contains this provision:

"This policy does not cover death, disability or other loss sustained while in military, naval, or air service of any country at war, except that should death, disability or other loss be sustained while the member is in such service, or within six months after the termination of such service, as a result of wounds, injuries or disease suffered or contracted while in such service, the association shall be liable only for the return of the amounts paid in by the member on this policy."

The facts in the case are stipulated, among which the following are pertinent to a proper consideration of the question before us, to-wit:

"Insured fulfilled and complied with all the conditions, provisions and stipulations contained in the policy; respondents are named as beneficiaries; insured died on December 7, 1941, and prior to and at the time of his death was a member of the armed forces and in the military service of the United States of America; his death occurred while in such service and as a direct result of an attack upon the Hawaiian Islands by the armed forces of the Imperial Japanese government, which attack occurred on the morning of December 7, 1941; on such date and at the time of the death of the insured no declaration of war existed between the United States of America and any other nation; proof of death was made by respondents in telegrams and letters which are set forth in the answer of appellant and are made a part of the stipulations; such documents were accepted by appellant as proving the death of the said Howard A. Rosenau while in the military service of the United States of America; dues and assessments on the insurance policy were paid in the sum of $16.75; at the time of his death this sum was tendered to respondents

upon appellant's acceptance of proof of death, respondents refused to accept the same; appellants offered to allow judgment in said amount; the sole and only issue to be determined in this action is whether or not the defendant could be relieved of liability of paying the face amount of said membership certificate due to the clause in said policy, relieving the defendant of the obligation of payment thereof, such death being sustained while the member is in military, naval or air service of any country at war; a declaration of war between the United States government against Japan was not made until December 8, 1941; no act of aggression or act of war had taken place openly or physically between Japan and the United States of America prior to December 7, 1941; if the death of the said insured was sustained while in the military, naval, or air service of the United States while such country was at war, the appellant is not liable for more than $16.75; on December 7, 1941 and at all times prior thereto, the United States government and the Imperial government of Japan were maintaining diplomatic relations; diplomatic and consular representatives of each of said governments were in residence in the country of the other and no recall of such diplomatic representatives had been effected by either of said governments prior to the Pearl Harbor attack on December 7, 1941; at no time prior to the formal declaration of war on December 8, 1941 against Japan had there been a determination by the political department of the United States government that a condition of war existed in which the United States government was a participant."

After the trial, the court made its findings and conclusions based on the above stipulations, finding and concluding generally in favor of the respondents and against the appellant's contentions, and thereafter entered judgment in favor of respondents against appellant, for the sum of $1000.00, the amount of the insurance, with statutory interest, and for respondents' costs and disbursements.

The appeal is from the judgment.

From the letters and telegrams constituting the proof of death, and which were accepted as such by appellant, it appears the insured was a seaman of the second class, United States Navy, at the time of his death; that he sustained death upholding the highest traditions of the navy in the defense of his country; that he lost his life

in the performance of his duty and in the service of his country.

In its answer appellant sets out that it operates on a limited co-operative mutual insurance plan and does not charge sufficient premiums on its members' policies to maintain regular legal reserves and surpluses maintained by companies operating on a regular. legal reserve basis, and that to offset the burden of ·sudden calamity which would necessitate heavy assessments on its members, and for their protection against such burden, the appellant adopted the plan of restrictive coverage, among which is the one set forth above in quotations from the policy.

As stated by appellant in its brief, this case involves the construction of the so-called war clause in the policy at issue, and the sole question for decision is whether or not the United States was at war when the Japanese began the unprovoked attack on the Hawaiian Islands on the fateful day of December 7, 1941.

It is well settled that, "The validity of a provision in a life or accident policy, or fraternal benefit certificate, entirely releasing the insurer from, or in some way restricting, its liability under the policy, because of the connection of the insured with military or naval forces or because of his entry into military service, is almost universally recognized." (Annotation 137 A.L.R., p. 1263.)

The rules to be applied in construction of contracts of this nature are equally well settled in this state and elsewhere, and may well be stated as follows: "All language used to limit insurer's liability in policy accepted by insured to cover all accidents must be construed strongly against insurer." (*Jensma v. Sun Life Assur. Co. of Canada*, 64 F. (2d) 457, reversing (D.C. 1932); *Jensma v. Benefit Ass'n. of Ry. Employees*, 1 Fed. Supp. 951. Certiorari denied (1933) *Sun Life Assur. Co. of Canada v. Jensma*, 53 S. Ct. 795, 289 U.S. 763, 77 L. Ed. 1505.) Ambiguous provisions of an insurance policy will be construed most strongly against the insurer, and in favor of the insured. (*Sweaney & Smith Co. v. St. Paul Fire & Marine Ins. Co. of St. Paul, Minn.*, 35 Ida. 303, 206 P. 178; *Sweaney & Smith Co. v. Hartford Ins. Co. of Hartford, Conn.*, 35 Ida. 319, 206 P. 183; *Sweaney & Smith Co. v. Reliance Ins. Co. of Philadelphia, Pa.*, 35 Ida. 318, 206 P. 183; *Sweaney & Smith Co. v. American Cent. Ins. Co. of St. Louis, Mo.*, 35

Ida. 320, 206 P. 184.) In general, a contract of insurance will be construed strictly against the insurer and liberally in favor of the insured. (*Sant v. Continental Life Ins. Co. of St. Louis, Mo.*, 49 Ida. 691, 291 P. 1072.) "Policy susceptible of more than one construction will be construed most favorable to insured." (*Maryland Casualty Co. v. Boise Street Car Co.*, 52 Ida. 133, 11 P. (2d) 1090.) "Where language of insurance policy may be given two meanings, one of which permits recovery and other does not, it is to be given construction most favorable to insured." (*Watkins v. Federal Life Ins. Co.*, 54 Ida. 174, 29 P. (2d) 1007.)

In support of the contention this country was at war at the time of the death of the insured, appellant, in part, relies upon the declarations contained in the president's memorable message to the Congress of December 8, 1941, and the resolution, Formal Declaration of War, by that body of the same date, both taken from the Congressional Record of December 8, 1941, as they appear at p. 9750 of vol. 87, No. 219.

The resolution is entitled "Joint Resolution declaring that a state of war exists between the Imperial Government of Japan and the Government and People of the United States," etc. The preamble recites that "Whereas, the Imperial Government of Japan has committed unprovoked acts of war," etc. The pertinent portion here, of the body of the resolution, states, "The state of war between the United States and the Imperial Government of Japan, which has been thrust upon the United States is hereby formally declared."

While the President's message of December 8th containing his summation of the many unprovoked, premeditated and dastardly attacks of the previous day, by the military and naval forces of the Imperial Japanese government, on our armed forces and territory, and at a time when we were at peace with that government, was an official act in conformity with his duty as Commander-in-Chief of the army and navy, and paved the way for the declaration of war on our part, which immediately followed, it in itself did not and could not amount to a legal determination of or a declaration of the existence of a state of war on the part of the American people, since the power to declare war is fixed solely in the Congress, by art. 1, sec. 8, of the Federal Constitution, which provides that the Congress has power to declare war.

■ That this power is exclusive and fixed is well established, one of the most recent decisions on the question being contained in the case of *West v. Palmetto State Life Ins. Co.*, 202 S.C. 422, 25 S.E. (2d) 475, 145 A.L.R. 1461, wherein the South Carolina court, in line with the holdings of other courts, said: "An act of Congress is necessary to the commencement of a foreign war, and is in itself a declaration; 1 Kent 55. It fixes the date of the war; Thayer, Const. Cas. 2352."

In "A Digest of International Law" by John Bassett Moore, vol. 7, p. 153, the author says: "Much confusion may be avoided by bearing in mind the fact that by the term war is meant not the mere employment of force, but the existence of the legal condition of things in which rights are or may be prosecuted by force. Thus, if two nations declare war one against the other, war exists, though no force whatever may as yet have been employed. On the other hand, force may be employed by one nation against another, as in the case of reprisals, and yet no state of war may arise. In such a case there may be said to be an act of war, but no state of war. The distinction is of the first importance, since, from the moment when a state of war supervenes third parties become subject to the performance of the duties of neutrality as well as to all the inconveniences that result from the exercise of belligerent rights."

■ It is true, as pointed out by appellant that the word war, in a broad sense, is used to connote a state or condition of war, warlike activities, fighting with arms between troops, etc., but we are here concerned with the meaning and intent of the word as contained in a formal, legal contract of insurance, a class of contracts which the courts are very frequently called upon to consider and construe, and it seems quite obvious that words and phrases in a contract of this nature, are used and intended to be used in the legal sense. The rule applicable here is stated in 17 C.J.S. (Contracts) p. 717, para. 300, as follows: "A phrase in a contract, if susceptible of two interpretations, must be given that according with settled law. Where the law gives to certain words an established meaning, this meaning is less readily controlled by the standard of interpretation otherwise applicable than is the meaning of other words."

■ The meaning of the word war in its legal sense

has been long understood, and it is likewise well established that courts are bound by declarations of war by the proper department of government, and until there has been such a determination can not take judicial notice of the existence of war. In 67 C.J., p. 336, para. 1, it is said: "War in the legal sense is the state of nations among whom there is an interruption of all pacific relations and a general contestation of arms by authority of the several sovereigns; it is not a mere contest of force, but must be an armed struggle carried on between two political bodies each of which exercises de facto authority over persons within a determinate territory, and its existence is determined by the authorized political department of the government. So, lawful war can never exist without the actual concurrence of the war-making power, but may exist prior to any contest of the armed forces. The courts are bound by a declaration or determination by the proper department of government that a war exists, while until there has been such a declaration or determination the courts cannot take judicial notice of the existence of a war by their government."

On p. 338 of said volume, para. 4, we find the statement: "A court cannot, however, take judicial notice of a war by its government until there has been some act or declaration creating or recognizing the existence of war by the department of the government clothed with the war-making power. Where war is declared by the sovereign power of a state, it is to be understood that the whole state declares war." See also *Bishop v. Jones*, 28 Tex. 294 (319); *Verano v. DeAngelis Coal Co.*, 41 Fed. Supp. 954; In re Wulzen, 235 Fed. 362.

To assume that the contract here was intended to limit liability to the extent contended for by appellants, would have the effect of adding, by application or construction, a meaning thereto, contrary to the intention as expressed by the parties. In other words, we would have to hold in effect that by the use of the phrase "of any country at war" the parties did not intend the use of the phrase, in its accepted legal sense, but, as a matter of fact, intended the contract to limit liability in cases where conditions of war, or conditions which might lead to war, existed. In other words, the court would thus be making a new contract for the parties, by adding to the contract phrases, terms and conditions, which it does not contain. This, of course,

is not one of the functions of a court. See 32 C.J. (Insurance), p. 1148, para. 258.

In the case of *West v. Palmetto State Life Ins. Co.*, 202 S.C. 422, 25 S.E. (2d) 475, 145 A.L.R. 1461, supra, the insured was also killed in the sneak attack by Japan at Pearl Harbor on December 7, 1941. The insurance company there urged before the court, its non-liability on the same theory as is argued by appellant here. The restrictive clause in the policies there involved was almost identical with the clause under consideration here, the only difference being, that there the policies limiting liability, provided the double indemnity feature would not be applicable in the event death should occur while the insured was engaged in military or naval service *in time of war*, while here the clause reads "While in military, naval or air service of any country at war."

In that well reasoned case, appellant insurance company relied, as does the appellant here, on the New York and Massachusetts cases hereinafter specifically identified in the following quotation from that decision, and the court in examining the judgment against the company, and holding it liable, said: "Appellant relies strongly upon two decisions from other jurisdictions (*Vanderbilt v. Travelers' Ins. Co.*, 112 Misc. 248, 184 N.Y.S. 54, and *Stankus v. New York L. Ins. Co.*, (1942) 312 Mass. 366, 44 N.E. (2d) 687), which upon consideration we do not think are contrary in reason or conclusion to our view of the instant case. They involved respectively, a death upon the S. S. Lusitania, sunk by German submarine long prior to the commencement of our war in 1917-18 against the Central Powers, and a death upon the destroyer Reuben James, lost on patrol in the Atlantic months before the commencement of our present war with Germany. But the policy provisions in question in those cases were quite different from those that are now under consideration. In one the policy excluded liability 'if the insured's death resulted from war or any act incident thereto.' And the other policy denied coverage for 'death resulting, directly or indirectly, wholly or partly, from war.' The policies in the present appeal contained restrictive provisions effective when the insured was 'engaged in military or naval service in time of war,' as pointed out above, very clearly meaning the engagement of the insured in such service of his country 'in time of war.'

"And this case was fought out in the court below upon

the question, stated hereinabove, whether our present war with Japan had begun on December 7, 1941, when the insured died as the result of Japanese attack on that day, and the controversy has not concerned itself with whether the insured died as the result, direct or indirect, of just any war, as was the question in the cited cases. Appellant recognized this narrow view of the issue presented in the opening paragraph of its printed brief and said: 'The only real question for the consideration of the court is whether on December 7, 1941, the United States of America, in the armed forces of which young West was then serving, was at war . . .' We think it clear that the stated question should be, and it is, answered in the negative.

"We are impressed with respondent's argument that it would be as logical to contend that the attack by the Emperor's fliers upon the U.S.S. Panay in the Yangtze river several years before was the beginning of the present war, as to so contend with respect to the sneak surprise attack on Pearl Harbor. The incidents do appear to have differed only in magnitude and location, and the declaration of war more promptly followed the latter. Japan's pretensive claim of mistake of identity in the case of the Panay has been discredited; it is believed that it was intended to test the will of this nation to resist aggression."

Appellant also relies upon Prize Cases, 67 U.S. 666, 17 L. Ed. 476, which arose out of the Civil War, and upon *Hamilton v. McClaughry*, 136 Fed. 445; the first of these cases deals with the law of nations in effect at that time regarding the right of "prize and capture" during periods of armed conflict. The decision was to the effect the President was acting within his authority under international law then in effect, and sustains the recognized rules of "prize and capture."

Moreover, in the Prize Cases, Mr. Justice Grier, in pointing out the distinction between the war powers of the President, and of the Congress, under the Constitution, said: "By the Constitution, Congress alone has the power to declare a national or foreign war. It cannot declare war against a state or any number of states, by virtue of any clause in the Constitution. The Constitution confers on the President the whole executive power. He is bound to take care that the laws be faithfully executed. He is Commander-in-Chief of the Army and Navy of the United States, and

of the militia of the several states when called into the actual service of the United States. He has no power to initiate or declare a war either against a foreign nation or a domestic state. But by the Acts of Congress of Feb. 28, 1795, ch. 36 (1 Stat. at L., 424), and 3d of March, 1807, ch. 39 (2 Stat. at L., 443), he is authorized to call out the militia and use the military and naval forces of the United States in case of invasion by foreign nations, and to suppress insurrection against the government of the state or of the United States."

The Hamilton case arose out of the Boxer Rebellion and the use of some United States troops in China. Hamilton, a soldier in our forces, was tried and convicted for a military offense committed in China, and the decision was a determination that he was subject to court martial under articles of war then in effect; that since the political and executive department had ordered troops sent to China, the articles of war were applicable.

In these cases the political and executive department of our government had authorized the warlike acts, out of which the litigation arose, while in the instant case no act or recognition had taken place by any department of our government with regard to the existence of war, or warlike activities, at the time of the death of the insured. (In fact, at that very time the two countries were engaged in peaceful negotiations, Japan's Kuruso, special ambassador of so-called "good will" being even then present in Washington ostensibly trying to obtain a peaceful settlement of the controversies between the two governments.) This, not having been done, this court, under the facts in this case, can not hold that this nation was at war on December 7, 1941, at the time of the death of the insured, or at any time prior to the declaration by the Congress on December 8, 1941.

The rule by which we are bound here is well stated in *Bishop v. Jones*, 28 Tex. 294 (319), as follows: " 'War' in its legal sense, has been aptly defined to be 'the state of nations among whom there is an interruption of all pacific relations and a general contestation of arms authorized by the sovereign.' It is true it may and has frequently in latter times been commenced and carried on without either a notice or declaration, but still there can be no war by its government of which the court can take judicial knowledge until there

has been some act or declaration creating or recognizing its existence by that department of the government clothed with the war-making power."

Also in the same case it is said: "War does not exist merely on the suspension of the usual relations of peace. Commerce may be interdicted without producing it. Reprisals and embargoes are forcible measurer of redress, but do not per se constitute war. Hostile attacks and armed invasions of the territory or jurisdiction of a nation, accompanied by the destruction of life and property, by officers acting under the sanction and authority of their governments, however great and flagrant provocations to war, are often atoned for and adjusted without its ensuing."

The Texas case above cited is referred to in respondent's brief and their argument based thereon impresses us as being logical and is as follows: "If the courts recognized a different definition of the word 'war' than that set forth in the last case above cited, it would mean that the United States has been constantly at 'war' with Japan since the sinking of the gunboat Panay in China in the early 1930's, and it would mean that Russia and Japan are now at 'war' by virtue of the fact that within recent years there have been border patrol clashes and hostilities in some force along the border between Manchuria and Russian Siberia. However, as stated in the Texas case, hostile attacks are often atoned for and adjusted without actual 'war' developing. The Panay incident was a hostile attack, but it was atoned for. The border clashes between Russian and Japanese territory were unquestionably armed invasions of the other's territory. Yet they were atoned for and 'war' did not ensue. It was possible, no matter how improbable, that the Pearl Harbor attack could have been atoned for and adjusted without 'war' necessarily ensuing."

Judgment affirmed, with costs to respondents.

Holden, C.J., Givens, J., concur.

AILSHIE, J., (Dissenting).—The policy carried by the decedent at the time of his death provides: "This policy does not cover death, disability or other loss sustained while in military, naval, or air service of any country at war, . . . ." The insured, Howard A. Rosenau was at the time of his death an enlisted man in the United States Navy

and was killed by the Japanese attack on Pearl Harbor, December 7, 1941. The sole question, therefore, to be determined in this case is: Was the United States "at war" December 7, 1941?

Now, let us see what the official report, of which we take judicial notice (Sec. 16-101, I.C.A.; *City of Twin Falls ex rel. Cannon v. Koehler*, 63 Ida. 562, 123 P. (2d) 715) says about the matter:

"On the morning of December 7, 1941, Japanese aircraft temporarily disabled every battleship and most of the aircraft in the Hawaiian area. Other naval vessels, both combatant and auxiliary, were put out of action, and certain shore facilities, especially at the naval air stations, Ford Island and Kaneohe Bay, were damaged. Most of these ships are now back with the fleet. The aircraft were all replaced within a few days, and interference with facilities was generally limited to a matter of hours.

"When the Japanese attacked Pearl Harbor, 2 surface ship task forces of the Pacific Fleet were carrying out assigned missions at sea, and 2 such task forces were at their main base following extensive operations at sea. Discounting small craft, 86 ships of the Pacific Fleet were moored at Pearl Harbor. Included in this force were 8 battleships, 7 cruisers, 28 destroyers and 5 submarines. No U. S. aircraft carriers were present.

"As result of the Japanese attack five battleships, the Arizona, Oklahoma, California, Nevada, and West Virginia; three destroyers, the Shaw, Cassin, and Downes; the mine layer Oglala; the target ship Utah, and a large floating drydock were either sunk or damaged so severely that they would serve no military purposes for some time. In addition, three battleships, the Pennsylvania, Maryland, and Tennessee, three cruisers, the Helena, Honolulu, and Raleigh, the seaplane tender Curtiss and the repair ship Vestal were damaged.

. . . .

"Eighty naval aircraft of all types were destroyed by the enemy. In addition, the Army lost 97 planes on Hickam and Wheeler Fields. Of these 23 were bombers, 66 were fighters, and 8 were other types.

"The most serious American losses were in personnel. As result of the raid on December 7, 1941, 2,117 officers

and enlisted men of the Navy and Marine Corps were killed, 960 are still reported as missing and 876 were wounded but survived. The Army casualties were as follows: 226 officers and enlisted men were killed or later died of wounds; 396 were wounded, most of whom have now recovered and have returned to duty.

. . . .

"At 7:55 a.m. on December 7, 1941, Japanese dive bombers swarmed over the Army Air Base, Hickam Field, and the naval air station on Ford Island. A few minutes earlier the Japanese had struck the naval air station at Kaneohe Bay. Bare seconds later enemy torpedo planes and dive bombers swung in from various sectors to concentrate their attack on the heavy ships at Pearl Harbor.

. . . .

"Although the Japanese launched their initial attack as a surprise, battleship ready machine guns opened fire at once and were progressively augmented by the remaining antiaircraft batteries as all hands promptly were called to general quarters. Machine guns brought down two and damaged others of the first wave of torpedo planes. Practically all battleship antiaircraft batteries were firing within 5 minutes; cruisers, within an average time of 4 minutes, and destroyers, opening up machine guns almost immediately, average 7 minutes in bringing all antiaircraft guns into action.

. . . .

"It is difficult to determine the total number of enemy aircraft participating in the raid, but careful analysis of all reports makes it possible to estimate the number as 21 torpedo planes, 48 dive bombers, and 36 horizontal bombers, totalling 105 of all types. Undoubtedly certain fighter planes also were present, but these are not distinguished by types and are included in the above figures.

"The enemy lost 28 aircraft due to Navy action. In addition, three submarines, of 45 tons each, were accounted for.

"The damage suffered by the U. S. Pacific Fleet as result of the Japanese attack on December 7, 1941, was most serious, but the repair job now is nearly completed, and thanks to the inspired and unceasing efforts of the naval and civilian personnel attached to the various repair yards, especially at Pearl Harbor itself, this initial handicap soon will be erased forever." (Navy Department Communiques

1-300—Office of Public Relations, U. S. Navy, [Gov. Printing Office, 1943] pp. 140-143.)

On the following day, December 8th, the President addressed the Congress, in part, as follows:

"Yesterday, December 7, 1941—a date which will live in infamy—the United States of America was suddenly and deliberately attacked by naval and air forces of the Empire of Japan . . .

"The attack yesterday on the Hawaiian Islands has caused severe damage to American naval and military forces. Very many American lives have been lost. In addition American ships have been reported torpedoed on the high seas between San Francisco and Honolulu . . .

"As Commander in Chief of the Army and Navy *I have directed that all measures be taken for our defense.*
. . . .

"*Hostilities exist.* There is no blinking at the fact that our people, our territory, and our interests are *in grave danger.*

"With confidence in our armed forces—with the unbounded determination of our people—we will gain the inevitable triumph, so help us God.

"I ask that the Congress declare that, *since the unprovoked and dastardly attack* by Japan on Sunday, December 7, *a state of war has existed* between the United States and the Japanese Empire."

(Italics inserted. Cong. Record, 77th Cong., vol. 87, part 9, pp. 9504-9505.)

It will be observed, from the message of the President, that, so far as the Commander in Chief of the Army and Navy of the United States was concerned, *hostilities existed;* and that such hostilities commenced when the Japanese armed forces "attacked by naval and air forces"—"the United States of America." It will also be observed that the President asked the Congress to "declare that, *since* the unprovoked and dastardly attack . . . . on Sunday, December 7, *a state of war has existed.*" We are therefore confronted with the record made by the President, as Commander in Chief of the Army and Navy, that "a state of war has existed . . . since . . . Sunday, December 7th";

and that, "as Commander in Chief of the Army and Navy", he had "directed that all measures be taken for our defense."

Immediately following the message of the President, the following resolution passed both the House and Senate:

"Whereas the Imperial Government of Japan has committed unprovoked acts of war against the Government and the people of the United States of America: Therefore be it

*"Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That *the state of war* between the United States and the Imperial Government of Japan *which has thus been thrust upon the United States* is hereby *formally declared;* and the President is hereby authorized and directed to employ the entire naval and military forces of the United States and the resources of the Government to carry on war against the Imperial Government of Japan; and, to bring the conflict to a successful termination, all of the resources of the country are hereby pledged by the Congress of the United States." (Italics inserted. Public Law 328—77th Congress—chap. 561, 1st Sess.; 50 U.S.C.A., Appendix (1943), p. 68.)

Congress accordingly declared that "the state of war between the United States and the Imperial Government of Japan . . . has thus been thrust upon the United States" and "is hereby formally declared." In other words, the resolution by Congress was an acknowledgment and recognition of both the state and condition of war, having its inception in the "unprovoked acts of war against the Government and the people of the United States", [Pub. Law 328, 77th Cong. S. J. Res. 116] committed on the previous day, (December 7th) at Pearl Harbor. It seems clear that the Congress did not consider or intend that the resolution was the *commencement* of the war; it was rather an acknowledgment of the existence of war which commenced the day before. It was official recognition of a status already existent.

Reference to the Congressional Record discloses that most of the members of the House of Representatives, who spoke officially for adoption of the resolution, understood that war already existed "We are at war", said different members. (p. 9529, vol. 87, part 9, Cong. Record.) It is clear from the record, that all the members of Congress thought and understood that they were declaring the existence of an attack and acts of war already committed by

the armed forces of the Japanese government; and that they did not consider they were initiating or starting the war on behalf of the United States by the passage of the resolution acknowledging the existence of a state of war.

In the face of these facts and records, we are confronted with the question: What is war? There may be room for doubt and argument as to whether a fight (war) is on as soon as the first blow is struck; but there is little room for doubt that a *fight* (war) is on when the adversary. returns blow for blow and the contest of strength and endurance begins.

Webster's New International Dictionary (2d ed., 1941) defines war as:

"1. The state or fact of exerting violence or force against another, now only against a state or other politically organized body, espe., a contest by force between two or more nations or states, carried on for any purpose; armed conflict of sovereign powers; declared and open hostilities . . . When begun by a formal declaration it is a *solemn war* . . .

"*War* is said to be that state in which a nation prosecutes its right by force (the Prize Cases, 2 Black. 635, 673). Cooley.

"Every contention by force between two nations in external matters, under the authority of their respective governments, is not only *war,* but public *war.* (4 U. S. (Dall.) 37, 42, 1 L. ed. 731.)

. . .
"3. The state or fact of being in conflict with, or actively opposed to, each other; hostility; strife; antagonism; also, a contest or struggle, for supremacy, revenge, or the like; . . .

"Syn. Conflict, battle."

The general and prevailing legal definition is that war is "an armed contest between nations". Black's Law Dictionary; Prize Cases, 2 Black. 635, 652, 666, 67 U. S. 666, 17 L. ed. 459; *Hamilton v. M'Claughry,* 136 F. 445, 449.

Professor Tomlinson, in his article on WAR, in 67 C. J., sec. 4, p. 338, says:

"War may be commenced, or its existence formally recognized, by declaration of one or both of the parties thereto; but, except as otherwise provided by the Hague Convention of 1907, a declaration is unnecessary, and war may

commence with the outbreak of actual hostilities, and may exist without a declaration on either side, or prior to a declaration, which, when made, *may declare the previous existence of war and fix the date on which it commenced.*"

In *Stankus v. New York Life Ins. Co.,* 312 Mass. 366, 44 N.E. (2d) 687, the supreme judicial court of Massachusetts defined war as

"A conflict between the armed forces of two nations under authority of their respective governments would be commonly regarded as war."

Substantially the same views were entertained and adopted by the New York court in *Vanderbilt v. Travelers' Ins. Co.,* 184 N.Y. Supp. 54, 112 Misc. Rep. 248, which case involved liability on an insurance policy carried by one who was drowned by the sinking of the Lusitania.

What seems to me to be the reasonable and rational interpretation and application of the term "war", as used in the policy here involved, is well stated by the annotator in 147 A.L.R., p. 1294, as follows:

"The term 'war' as used in an insurance policy restricting liability for loss of life due to war has been construed to include wars in which the United States was not a formal participant. Thus, in *Stankus v. New York L. Ins. Co.,* (1942) 312 Mass. 366, 44 N.E. (2d) 687, where an action was brought to recover double indemnity benefits under a policy of life insurance providing for the payment of such indemnity 'upon receipt of due proof . . . that the death of the insured resulted directly and independently of all other causes from bodily injuries effected solely through external, violent and accidental means . . . provided, however, that such double indemnity shall not be payable if the insured's death resulted directly or indirectly from . . . war or any act incident thereto,' it was held that no recovery could be had upon proof that the insured, a seaman on a United States destroyer, lost his life when his ship was torpedoed while it was convoying merchant ships in the Atlantic Ocean before the formal declaration of war by the United States upon Germany and her allies, the court saying: 'As in the case of any other contract, the words of an insurance policy, in the absence of ambiguity, must be given their usual and ordinary meaning. The term "war" is not limited, restricted, or modified by anything appearing in the policy. It refers to no particular type or kind of war,

but applies in general to every situation that ordinary people would commonly regard as war. There is nothing in the policy that indicates that the word was used in any vague, indefinite, or ambiguous sense.' "

Where the armed forces of two sovereign nations strike blows at each other, as occurred at Pearl Harbor on December 7, 1941, and do so under the direction and authority of their respective governments, it is difficult for me to understand why that is not *war*. Here we have a case where a mass invasion was launched by the Japanese government's armed forces against the United States and its people, killing 2,117 officers and enlisted men of our Navy and Marine Corps, 960 reported missing and 876 wounded; and killing 225 officers and enlisted men in our Army, 396 wounded; and, in addition thereto, destroying 80 of our Naval aircraft, destroying 97 planes at Hickam and Wheeler Fields, wrecking Hickam Field and committing other serious losses. According to the official report, the United States armed force, under the authority of the Commander in Chief of Army and Navy, immediately after the commencement of the attack, entered the combat and succeeded in repelling the invasion. This it seems to me, was "war." The President, as Commander of Chief of the Army and Navy, could not wait for Congress to officially declare war. He accordingly ordered into action all available naval, air and military forces to repel the attempted invasion.

I think the average citizen, who might apply for and procure a life insurance policy, containing the war clause here in question, would undoubtedly think and believe that such a national military status was war; and he would not believe himself insured against such a casualty.

Respondents place their chief reliance on *West v. Palmetto State Life Insurance Co.*, 202 S.C. 422, 25 S.E. (2d) 475, 145 A.L.R. 1461. Notwithstanding the high esteem which I entertain for the South Carolina court, I am unable to follow or adopt its course of reasoning or conclusion in that case.

Under the contention made by respondents, an insurance policy non-liability war clause can never be available as a defense unless Congress has, previously to the death of the insured, formally declared war—no matter what the President as Commander in Chief may have done in defense of the country against invasion, although evidenced by

executive statement and the records of the war department. If that contention were true and were followed by the courts, insurance companies would be issuing policies containing the war clause in question and always be liable on the death of the insured in every undeclared war, no matter how long prosecuted or what the result might be.

Our political history demonstrates that most wars have been commenced and prosecuted without any formal declaration of war; and that war dates from its *inception* rather than from the time on which some formal declaration to that effect is made. In the Stankus case above cited, the Massachusetts court had the following to say on this point: [312 Mass. 368, 44 N.E. (2d) at p. 688]

"The plaintiff contends that the policy exempts only a death that resulted from a war in which the United States was a participant, and that as this government was not engaged in any war on October 30, 1941, the death of the insured could not have resulted from a war as that term was employed in the policy. The government of the United States had not at that time declared war upon any nation (see 55 U.S. Sts. at Large, cc. 561, 564, 565, passed December 8, 1941, and December 11, 1941, declaring war upon Japan, Germany and Italy), and no nation had then declared war against us. But the *existence of a war is not dependent upon a formal declaration of war*. Wars are being waged today that began without any declaration of war. *The attack by the Japanese on Pearl Harbor on December 7, 1941, is the latest illustration*. This is not a modern method, for it has been said that, from out of one hundred eighteen wars that occurred between 1700 and 1872, in hardly ten did formal declarations precede the commencement of hostilities." (Italics inserted.)

It is my conclusion, that the judgment in this case should be reversed.

Budge, J., concurs in the foregoing dissent.