## Harding, Appellant, *v.* Pennsylvania Mutual Life Insurance Company.

Argued March 3, 1952. Before RHODES, P. J., RENO, DITHRICH, ROSS, ARNOLD and GUNTHER, JJ. (HIRT, J., absent).

*William A. Valentine,* for appellant.

*Nelson A. Bryan,* for appellee.

OPINION BY DITHRICH, J., July 17, 1952:

On July 25, 1950, one month to the day after the commencement of hostilities in Korea, defendant-appellee issued a policy of insurance upon the life of Clyde P. Harding, minor plaintiff's deceased husband. The face amount of the policy was $2500, but it contained a provision providing for double indemnity if the death of the insured resulted solely through accidental means. The policy provided in part as follows:

*"Risks Not Assumed:*—The Company shall not be liable for the additional Accidental Death Benefit specified above if said death shall result by reason of any of the following: . . . . (d) Military, air or naval service in time of war. . . .

"*Termination*:—These provisions for the additional Accidental Death Benefit shall immediately terminate: . . . (b) if the Insured shall at any time, voluntarily or involuntarily, engage in military, air or naval service in time of war; . . ."

The insured was a member of the 28th Division, Pennsylvania National Guard, having enlisted December 5, 1949. The 28th Division was inducted into the federal service on September 5, 1950, and on September 11, 1950, the insured was killed in a railroad accident on the Pennsylvania Railroad en route to Camp Atterbury, Indiana, for military training.

The minor plaintiff brought action in assumpsit for the full amount of the policy, to wit, $5000, claiming double indemnity on account of the accidental death, and subsequently moved for judgment on the pleadings under Rule 1034 of the Pa. Rules of Civil Procedure. The motion was heard by the court en banc and after argument judgment was directed to be entered for the plaintiff in the sum of $2430.40, being the amount due under the principal insuring clause of the policy after an adjustment of a year's premium and a refund for the premium collected on the accidental death benefit. Judgment was denied plaintiff for the accidental death benefit; hence this appeal.

Appellee concedes that the death of the insured "was not the result of the insured's military service in time of war; the only contention being that upon the insured's induction into the armed forces of the United States on September 5, 1950, the . . . liability for double indemnity . . . was terminated." The learned court below so held, following the decision of this Court in *Wolford v. The Equitable Life Ins. Co. of Iowa*, 162 Pa. Superior Ct. 259 (allocatur refused ibid. xxv), 57 A. 2d 581, and *Throne v. Pa. Mutual Life Ins. Co.*, 58 D. & C. 109.

In the *Wolford case,* where a policy of life insurance provided that double indemnity benefits "shall terminate . . . in the event that the insured shall engage in military . . . service in time of war," we held, in an opinion by ARNOLD, J., that the double indemnity provisions terminated when the insured entered the military service of the United States in time of war. There, as here, the insured's death by accidental means was admitted and there, as here, it was argued that since there was no causal connection between the insured's engaging in military service and his death the insurer was liable. But we said (pp. 260, 261) :

"The plaintiff-appellant contends that the word 'engage' (in clause 19 of the policy) means more than merely 'status', and that it signifies 'action' or 'active participation', and under the policy denotes such action as increased the hazard.

"Clause 19 is not a 'result' clause as in Selenack, Admr., v. Prudential Insurance Co. of America, 160 Pa. Superior Ct. 242, 50 A. 2d 736, in which the policy provided for an exclusion of liability ' "if the death . . . resulted . . . from having been engaged in military or naval service in time of war." ' Such a limitation clause has generally been construed as being tied into the doctrine of causation, so that unless the accident and death *resulted,* i. e., were caused by, or flowed from, the military service, the insurer was held liable. In other words, in the 'result' clause cases, mere status is usually held not to be determinative of liability, the real question being causation or increased hazard. [In the *Selenack* case, supra, we were concerned only with the *resulting* type of exclusion clauses.] . . .

"The construction of such provisions in insurance contracts depends entirely upon the precise wording of the particular policy. [The material wording, to wit, "engage in military . . . service in time of war" is

precisely the same in the policy in the *Wolford* case and
the case at bar.] In the present contract the insurer, by
plain words, provided for the *termination* of the double
indemnity provisions upon the happening of an event.
What event? The contract answers this without am-
biguity: '[In] the event that the insured shall engage in
military . . . service in time of war.' Since the event
bears no relationship to cause and effect, the policy
terminated when the insured entered the military serv-
ice of the United States in time of war, for then he was
*engaged* in the military service and was required, except
for leaves or furloughs, to give his entire time thereto.
We construe the word 'engaged' to mean 'enter into'
where used in the termination clause, but not neces-
sarily so in a result clause."

The *Wolford* case, however, while recognized as
authority for holding that "status" and not "character
of service" is the test of termination of the double in-
demnity feature, is not controlling here, for there the
fact that the insured met his death "in time of war" was
not questioned. Here it is seriously questioned. In
fact, the case turns on what the parties to the contract
intended by the word "war." As stated by appellee in
its brief, there are two phases to its argument: "(a)
That at the time of insured's induction into federal serv-
ice, to wit, September 5, 1950, the United States was
still technically at war with the Axis powers and
Japan. (b) That the condition of war existed in Korea,
wherein the United States was a participant, and thus
at war at the time of the insured's induction into federal
service."

Before entering upon a discussion of those phases,
we note that appellee stresses the fact that "At the time
the contract of insurance was issued, the insured was
not a member of the military forces of the United States,
he not having been inducted into federal service until

September 5, 1950." But he, having enlisted December 5, 1949, in the 109th Field Artillery, 28th Division, was a member of the National Guard when the policy was issued. Appellee argues that "At the time of the issuance of the policy, American troops had already been ordered into action" in Korea. "It is therefore only reasonable to assume that when this contract was issued . . . it was the intention of the parties that it would not be binding upon the parties . . . if the insured at any time during the life of the policy entered the military . . . service of the United States, in time of war." Since the insured was already "engage[d] in military service" (see National Defense Act of 1916, as amended by The Army Organization Act of 1950, Public Law 581, 81st Congress), we are not prepared to say, nor are we required so to do, in view of our conclusion as to the ultimate determinative factor in this case, that there was a change in the insured's status from civilian to military status within the *termination* clause of the contract.

The learned court below upheld the first phase of appellee's argument, to wit, that "on September 11, 1950, the United States was still at war with Germany, Italy, and Japan." It held that "Although the 'shooting' war was over, no treaties of peace had yet been ratified." But the President of the United States on December 31, 1946, issued a proclamation declaring "that the hostilities have terminated," No. 2714, 12 F.R.I.—Code of Fed. Regs. 1946 Supplement, Titles 1-8, page 77; and the Congress, in joint resolution, on July 25, 1947, officially declared the war's end. See also *United States v. Anderson*, 76 U. S. 56. In the light of these acts of the executive and legislative branches of the Government, it is not necessary to further elaborate the point that for the purpose of the risk assumed by the policy in this case the war with the Axis powers had ended.

We now come to the second and crucial phase of appellee's argument, to wit, that the United States was at war with Korea at the time of the insured's induction into federal service. Not only is the question one of first impression in this Commonwealth, but so far as we have been able to discover, both by our own and counsel's diligent and exhaustive research, the question has not heretofore been raised in the reported decision of any appellate court, either federal or state. The nearest approach to it is in *Youngstown Sheet & Tube Co., et al., v. Sawyer,* 343 U. S. 579, the so-called "Steel Seizure Cases" in the United States Supreme Court. In a concurring opinion Mr. Justice FRANKFURTER said (p. 613): "In this case, reliance on the powers that flow from *declared* war has been commendably disclaimed by the Solicitor General." (Emphasis added.) And in a separate concurring opinion Mr. Justice JACKSON said (p. 641):

"The clause on which the Government next relies is that 'The President shall be Commander in Chief of the Army and Navy of the United States . . . .' These cryptic words have given rise to some of the most persistent controversies in our constitutional history. Of course, they imply something more than an empty title. But just what authority goes with the name has plagued presidential advisers who would not waive or narrow it by nonassertion yet cannot say where it begins or ends. It undoubtedly puts the Nation's armed forces under presidential command. Hence, this loose appellation is sometimes advanced as support for any presidential action, internal or external, involving use of force, the idea being that it vests power to do anything, anywhere, that can be done with an army or navy.

"That seems to be the logic of an argument tendered at our bar—that the *President having, on his own responsibility, sent American troops abroad* derives from

that act 'affirmative power' to seize the means of producing a supply of steel for them. To quote, 'Perhaps the most forceful illustration of the scope of Presidental power in this connection is the fact that *American troops in Korea,* whose safety and effectiveness are so directly involved here, *were sent to the field by an exercise of the President's constitutional powers.' Thus, it is said, he has invested himself with 'war powers.'*

"I cannot foresee all that it might entail if the Court should indorse this argument. *Nothing in our Constitution is plainer than that declaration of a war is entrusted only to Congress.* Of course, a state of war may in fact exist without a formal declaration. But no doctrine that the Court could promulgate would seem to me more sinister and alarming than that a President whose conduct of foreign affairs is so largely uncontrolled, and often even is unknown, can vastly enlarge his mastery over the internal affairs of the country *by his own commitment of the Nation's armed forces to some foreign venture.* I do not, however, find it necessary or appropriate to consider the *legal status of the Korean enterprise* to discountenance argument based on it." (Emphasis added.)

Since there appears to be general agreement that the conflict in Korea is not declared war, our next and final step is to determine whether it is undeclared war. That there is a marked distinction between the two was first pointed out in *Bas v. Tingy,* U. S. Supreme Court, 4 Dallas 37, and most recently in *New York Life Ins. Co. v. Durham,* 166 F. 2d 874. In that case the New York Life Insurance Company issued its policy of insurance on the life of Lewis Durham, conditioned that the amount payable would be the restricted amount (as therein defined) if the death of the insured should occur "while . . . in the military . . . forces of any country engaged in war. . . .. '[W]ar' includes unde-

clared war." As stated in the opinion of the Court (pp. 875, 876):

". . . The existence of war and restoration of peace are determined . . . by the political departments of our Government, and such determinations are conclusively binding upon the Courts in all matters of *state* or *public* concern . . . *But in all private matters, unaffected by public interest, the parties are undoubtedly free to contract with reference to war and to give it such definition, connotation and meaning, as does not infringe upon public policy.* [Citing cases.] See cases collected in Annotation 168 A. L. R. 685. . . .

"The parties in this case . . . contracted with reference to a risk assumed for a premium paid. When they came to express the limitations upon the risk assumed, they obviously had in mind the extraordinary risk incident to service in the military forces of any country engaged in war, *declared or undeclared.* By including undeclared war, they chose not to use the word 'war' in its technical or formal sense, but rather in the practical and realistic sense in which it is commonly used and understood—in the sense it bears to the hazards to human life. The parties clearly contemplated that the country might be engaged in an undeclared war, without political determination or formal recognition thereof, yet the Courts would be required to take cognizance of its existence by an appraisal of actualities in order to give legal effect to the insurance contract." (Emphasis added.)

If that is what the parties in the case at bar contemplated, why did they not make clear their intention by including undeclared war, as was done in the *Durham* case and in *Stinson v. New York Life Ins. Co.,* 167 F. 2d 233. In the *Stinson* case the policy stated, page 234, that " 'Wherever used in this Policy, . . . "War" includes undeclared war' "; and on page 236

the Court said referring to *Citizens Protective League v. Clark,* 81 U. S. App. D. C. 116, 155 F. 2d 290: "In the Clark case we were treating a matter of public law [Enemy Alien Act]; here we are concerned with a private contract, and a distinction must be maintained."

The case for the appellee has been ably presented but we have not been furnished with, nor have we been able to find, a direct precedent, either legal or factual, for the action of the President of the United States in dispatching troops to Korea. That is not surprising in view of the fact that in a memorandum of July 3, 1950, prepared by the Department of State on the authority of the President to repel the attack in Korea, Secretary of State Acheson said: "After June 25,[1] all action in Korea has been under the aegis of the United Nations." House Report No. 127, 82d Congress, 1st Session, a report of the Committee on Foreign Affairs pursuant to H. Res. 28, has been titled "Background Information on the Use of United States Armed Forces in Foreign Countries" and published by the Government in pamphlet form. It is most interesting, comprehensive and instructive. One significant feature of the report is that nowhere is the action in Korea referred to as "war," either declared or undeclared. It is simply referred to as "Action in Korea," and the area is not the "war" area but the "combat zone," defined by the Congress to mean "any area which the President of the United States, by Executive order, designates . . . as an area in which Armed Forces of the United States are or have [after June 24, 1950] engaged in combat."[2]

---

[1] The date of the invasion of the Republic of Korea by the armed forces of North Korea and found by the United Nations Security Council in its resolution of the same date to constitute a breach of international peace.

[2] Public Law 814, 81st Cong., sec. 202.

Executive Order 10195 designated Korea and adjacent waters as a combat zone "in which Armed Forces of the United States have engaged in combat: . . . The date of the commencing of combatant activities in such area is hereby designated as June 27, 1950."[3]

We are not here concerned with the constitutional authority of the President to dispatch troops to Korea to repel the armed aggression against the Republic of Korea, generally conceded to be in pursuance to and under the authority of article 39 of the United Nations Charter.[4] Our concern is whether the nation has thereby been committed to an undeclared war of which we must take judicial notice. *"The courts are bound by a declaration or determination by the proper department of government that a war exists, while until there has been such a declaration or determination the courts cannot take judicial notice of the existence of a war by their government"*: 67 C. J. 336. (Emphasis added.) Cited to the text is *Bishop v. Jones & Petty,* 28 Tex. 294, to which we shall later refer in more detail. And on page 338, after stating that war may commence or exist without a declaration on either side, it is said that *"A court cannot, however, take judicial notice of a war by its government until there has been some act or declaration creating or recognizing the existence of war*

---

[3] 15 Fed. Reg. 9177.

[4] The Security Council resolution of June 27, passed after the North Korean authorities had disregarded the June 25 resolution, calling upon "the authorities in North Korea (a) to cease hostilities forthwith; and (b) to withdraw their armed forces to the thirty-eighth parallel," recommended "that members of the United Nations furnish such assistance to the Republic of Korea as may be necessary to repel the armed attack and to restore international peace and security in the area." This recommendation was also made under the authority of article 39. "The President's action seeks to accomplish the objectives of both resolutions." Department of State Memorandum of July 3, 1950, supra.

*by the department of the government clothed with the war-making power."* (Emphasis added.)

In *Bishop. v. Jones & Petty, supra,* 28 Tex. 294, where the question involved was the date of the beginning of the Civil War, the Court said (p. 319) : "War in its legal sense has been aptly defined to be 'the state of nations among whom there is an interruption of all pacific relations, and a general contestation of arms authorized by the sovereign.' It is true, it may and has frequently in latter times been commenced and carried on without either a notice or declaration. But still, there can be no war by its government, of which the court can take judicial knowledge, until there has been some act or declaration creating or recognizing its existence by that department of the government clothed with the war-making power." In the famous *Prize Cases* (The Amy Warwick), arising out of the Civil War, 2 Black 635, 17 L. Ed. 459, where the court divided five to four, it was held that civil war is never solemnly declared and that the proclamation of President Lincoln, establishing a blockade of all Southern ports and ordering the capture of all vessels violating the blockade, was a political determination of a state of war of which the courts were bound to take judicial notice.

The Japanese attack on Pearl Harbor is most frequently cited as the latest illustration of war without formal declaration. But as stated in *New York Life Ins. Co. v. Bennion,* 158 F. 2d 260, 262: ". . . it seems to be agreed that the existence or non-existence of a state of war is a political question, to be determined by the political department of our Government. The basic difference lies in the contention on the one hand that a formal declaration by the Congress, which alone has the constitutional power to declare and make war, is an essential prerequisite to judicial cognizance of its existence; and the contention on the other hand that the

existence of a war is not dependent upon its formal declaration, but rather is determinable from an appraisal of actualities; that the formal declaration by Congress on the day after the attack [Pearl Harbor] was merely a formal recognition of that which was already actually in existence. Both contentions find very respectable support in the adjudicated cases."

In support of the former contention are: *West v. Palmetto State Life Ins. Co.*, 202 S. C. 422, 25 S. E. 2d 475, 145 A. L. R. 1461; *Rosenau v. Idaho Mutual Benefit Assn.*, 65 Idaho 408, 145 P. 2d 227; *Savage v. Sun Life Assur. Co. of Canada, D. C.*, 57 F. Supp. 620; *Gladys Ching Pang v. Sun Life Assur. Co.*, Supreme Court of the Territory of Hawaii, October Term, 1945.

In support of the latter contention are: *New York Life Ins. Co. v. Bennion*, supra, 158 F. 2d 260; *New York Life Ins. Co. v. Durham*, supra, 166 F. 2d 874; *Stinson v. New York Life Ins. Co.*, supra, 167 F. 2d 233. In both the *Durham* and *Stinson* cases " 'war' includes undeclared war."

It may or may not be significant that in *New York Life Ins. Co. v. Bennion*, supra, a policy on the life of Captain Bennion, who was killed while in command of the Battleship West Virginia at Pearl Harbor, did not cover "undeclared war." It is, however, in our opinion, a fact worth noting. In that case the policy excluded coverage for death resulting from "war or any act incident thereto." The court below entered judgment for the widow on the double indemnity provision for accidental death, but the Circuit Court of Appeals reversed the judgment.

Since there is a valid distinction between declared and undeclared war, which has been recognized by insurance companies, notably the New York Life Insurance Company, in drawing up contracts of insurance especially since Pearl Harbor, the use of the term

"war" in the contract under consideration presents an ambiguity. That being the case, the cardinal rule of construction, that where a policy is susceptible of more than one construction it must be liberally construed in favor of the insured and against the insurer, is so universally and firmly established as to no longer require citation. Keeping in mind that the policy in this case was issued September 5, 1950, approximately two and one-half years after the decisions in the *Durham* and *Stinson* cases, supra, it is reasonable to assume that the officers of the appellee insurance company had knowledge of the distinction made between declared and undeclared war in similar contracts of insurance.

The question, then, naturally arises, if the insurer did not intend to use the word "war" in its technical and legal sense, i.e., war declared by Congress, but intended it to include undeclared war as well, why was that provision not inserted in the contract. The contract presumably was prepared by competent insurance company attorneys, who, no doubt, were familiar with the most recent decisions relating to war risk provisions in insurance contracts; and if the appellee did not intend to assume risks growing out of hostilities short of war it could have so provided by extending the phrase "in time of war" to include undeclared war.

In *West v. Palmetto State Life Ins. Co.*, supra, 202 S. C. 422, 25 S. E. 2d 475, a leading case on the subject, it was held (pp. 476 and 477 of 25 S. E. 2d) :

"A single sharp issue is presented by this appeal. The life of Broadus F. West was insured under two policies issued by appellant. . . . They contained provisions for double indemnity in case of accidental death, but provided that such would not be applicable in the event that death should occur while the insured was 'engaged in military or naval service in time of

war,' . . . [T]he insured was enlisted in the United States Navy . . . when he was killed at Pearl Harbor on December 7, 1941, . . . along with approximately thirty-five hundred others. . . .

". . . the provisions in the policy contracts were made in contemplation of the law of the United States under which only Congress may declare war, which it had not done at the time of the attack by enemy forces upon Pearl Harbor so that the latter did not constitute war in the legal sense or within the meaning thereof intended in the policies. . . .

". . . That the policy contracts were entered into by the parties in contemplation of that clear law, and subject to it, cannot be denied; and they are bound by it.

"Appellant relies strongly upon two decisions from other jurisdictions (Vanderbilt v. Travelers' Ins. Co., 112 Misc. 248, 184 N. Y. S. 54, and Stankus v. New York L. Ins. Co., 1942, 312 Mass. 366, 44 N. E. 2d 687) which upon consideration we do not think are contrary in reason or conclusion to our view of the instant case. They involved respectively, a death upon the S. S. Lusitania, sunk by German submarine long prior to the commencement of our war in 1917-18 against the Central Powers, and a death upon the destroyer Reuben James, lost on patrol in the Atlantic months before the commencement of our present war with Germany. But the policy provisions in question in those cases were quite different from those that are now under consideration. In one the policy excluded liability 'if the insured's death resulted from war or any act incident thereto.' And the other policy denied coverage for 'death resulting, directly or indirectly, wholly or partly, from war.'. The policies in the present appeal contained restrictive provisions effective when the insured was 'engaged in military or naval

service in time of war,' as pointed out above, very clearly meaning the engagement of the insured in such service of his country 'in time of war.' "

It has been argued by some that if the action in Korea did not assume a status of war at its inception it acquired that status when Communist China intervened. That is merely a difference in degree. As pointed out in *Stinson v. New York Life Ins. Co.*, supra, 167 F. 2d 233, 235, 236, cases construing clauses making "status" of the insured, or "cause of death" of the insured, the determining factor are not particularly helpful for "Here we have a 'status' clause extended to include also the 'war status' of the country."

Since "war" is a word which has been held to import various meanings, it is incumbent upon the insurer to make clear that it applies to undeclared war, as well as to declared war, for even if the action in Korea should be held to be war, it is at most an undeclared war. In our opinion the insurer has failed to meet the burden cast upon it. The attempt of the appellee to evade liability of double indemnity should not receive judicial condonation. The phraseology of the policy was chosen by the insurer and tendered in fixed form to the prospective policyholder, and since its language is reasonably open to two constructions, we will adopt that construction which is more favorable to the insured. *Koser v. American Casualty Co. of Reading*, 162 Pa. Superior Ct. 63 (allocatur refused ibid. xxv), 56 A. 2d 301; *Snader v. London & Lancashire Indem. Co. of America*, 360 Pa. 548, 62 A. 2d 835. The question involved is timely and important, and, while the decisions on the interpretation of the words "in time of war" are in apparent conflict, it is our considered judgment that the weight of authority is with the appellant.

The attack on the Republic of Korea has been likened to the Japanese attack on Pearl Harbor, but the aggression which we are seeking to repel in Korea has an entirely different status than the attack upon our fleet and other armed forces at Pearl Harbor. That constituted a direct attack upon the United States but, according to the weight of authority, war with Japan did not begin until the next day, following the declaration by Congress. We are not unmindful of the extent of the hostilities and the casualties we have suffered from the action in Korea, but as stated in Words and Phrases, Permanent Edition, Vol. 44, page 624, " 'War' in law, is not a mere contest of physical force, on however large a scale."

As ably stated in *Rosenau v. Idaho Mutual Benefit Assn.,* supra, 65 Idaho 408, 145 P. 2d 227, 230: ". . . we are here concerned with the meaning and intent of the word [war] as contained in a formal, legal contract of insurance, a class of contracts which the courts are very frequently called upon to consider and construe, and it seems quite obvious that words and phrases in a contract of this nature, are used and intended to be used in the legal sense. The rule applicable here is stated in 17 C. J. S., (Contracts,) page 717, para. 300, as follows: 'A phrase in a contract, if susceptible of two interpretations, must be given that according with settled law. Where the law gives to certain words an established meaning, this meaning is less readily controlled by the standard of interpretation otherwise applicable than is the meaning of other words.' "

Judgment reversed and here entered for the plaintiff for the full amount of the policy.